John BERSHAD, Plaintiff
Below, Appellant,

v.

CURTISS–WRIGHT CORPORATION, a
Delaware Corporation, and Dorr–Oliver
Inc., a Delaware Corporation.

Supreme Court of Delaware.

Submitted: Jan. 27, 1987.
Decided: Dec. 30, 1987.

Kevin Gross, of Morris and Rosenthal, P.A., Wilmington, and Lawrence Milberg (argued), and Steven Schulman, of Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, of counsel, for appellant.

Robert K. Payson, (argued), and Arthur L. Dent, of Potter, Anderson & Corroon, Wilmington, for appellee Curtiss–Wright Corp.

A. Gilchrist Sparks, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellee Dorr–Oliver Inc.

Before HORSEY, MOORE and WALSH, JJ.

MOORE, Justice.

Plaintiff, John Bershad, brought this action against the defendants, Curtiss–Wright Corporation ("Curtiss–Wright") and Dorr–Oliver Incorporated ("Dorr–Oliver"), in the Court of Chancery, challenging a 1979 cash-out merger of Dorr–Oliver by its parent, Curtiss–Wright. Bershad alleged (1) that the merger was effectuated without a proper business purpose; and (2) that the shareholder vote approving the merger was invalid since Dorr–Oliver's proxy statement failed to inform minority stockholders that Curtiss–Wright had a strict policy against selling its 65% holdings in Dorr–Oliver.

The Vice Chancellor held that under *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983), Bershad's improper purpose claim failed. In addition, the trial judge found that defendants did not breach their fiduciary duty of candor since the proxy statement fully informed minority shareholders of all material facts regarding the merger. The Court of Chancery then dismissed the claims of Bershad and all stockholders who either voted in favor of the merger or accepted its benefits by tendering their shares for payment under the merger agreement.

In this appeal, Bershad raises the same issues, and also asserts that Curtiss–

Wright, as majority shareholder, owed the minority a fiduciary duty to auction Dorr–Oliver based on our decision in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986). Bershad further contends that *Weinberger* provides a quasi-appraisal remedy for all informed minority shareholders challenging a cash-out merger effectuated on or before February 1, 1983. We affirm the Vice–Chancellor's rulings and reject Bershad's contentions that in these circumstances *Revlon* requires a majority shareholder to sell its stock in a subsidiary to the highest bidder. *See, Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, 1345 (1987). Further, Bershad is not entitled to pursue a quasi-appraisal remedy under *Weinberger*. An informed minority shareholder, like Bershad, who either votes in favor of a merger or accepts the benefits of the transaction cannot thereafter attack the fairness of the merger price.

## I.

In March, 1979 Curtiss–Wright owned 1,642,751 shares of Dorr–Oliver's common stock, representing 65% of the total common stock outstanding.[1] Curtiss–Wright began acquiring Dorr–Oliver stock in 1968, when it originally bought 261,500 shares, and had a continuing program to purchase up to 80% of Dorr–Oliver's stock. Thus, Curtiss–Wright owned 21.6% of Dorr–Oliver in 1968, 55% in 1969, 63% in 1972, and ultimately increased its holdings to 65% by 1979.

In early 1979, Curtiss–Wright's board decided that a merger with Dorr–Oliver would be beneficial to Curtiss–Wright.[2] At a directors meeting in January, 1979, the Dorr–Oliver board adopted a resolution authorizing a study of the proposed merger. Means Johnston, Jr., an outside independent Dorr–Oliver director, advised the board concerning the transaction.[3] Mr. Johnston selected the investment banking firm of Lazard Freres & Company to advise the Dorr–Oliver board on the fairness of Curtiss–Wright's cash-out offer of $23 per share.

In a letter dated March 13, 1979, Lazard Freres rendered the following opinion on the proposal:

In connection with our review of the proposed terms of the combination, we have read financial and operating data with respect to Dorr–Oliver available in published sources and financial and business information relating to Dorr–Oliver supplied to us by the Company. We have also conducted discussions with the management of Dorr–Oliver regarding its business, prospects and financial condition. . . .

We have also considered, among other things, the market value of the common stock of Dorr–Oliver in recent years, its dividend history, net worth, revenues and earnings in recent years and its future prospects.

Based on our analysis of the foregoing and upon such other factors as we deem relevant, including our assessment of general economic, market and monetary

---

1. Dorr–Oliver was principally engaged in selling process equipment and systems for the continuous separation, mixing, handling or other treatment of solids or gases. In addition, the company sold equipment used in connection with mining operations and designed process equipment stations and systems.

2. Curtiss–Wright provided the following reasons for the merger:
 (a) The company's credit standing would be enhanced by the sound financial position of Dorr–Oliver.
 (b) The cash and other resources of both companies could be treated as a pool of resources which could be utilized by both companies in the conduct of their business activities.
 (c) Curtiss–Wright would be free of the constraints arising from potential conflicts of interest between itself and the minority shareholders of Dorr–Oliver.
 (d) Economies could be realized by both companies through integrated procurement of insurance, employee benefits and other items.

3. In this context the term "outside independent director" refers to a director who had no affiliation with Curtiss–Wright, and as to Dorr–Oliver, one who had no such affiliation except that of director.

conditions, we are of the opinion that the merger exchange rate of $23.00 per share cash for the shares of Dorr–Oliver not presently held by Curtiss–Wright is fair to the shareholders of Dorr–Oliver (other than Curtiss–Wright) from a financial point of view.

At a meeting on March 13, 1979, the Dorr–Oliver board considered this fairness opinion along with other pertinent information. With two directors absent, the board approved the merger agreement at $23 per share by a vote of seven to zero.[4] The agreement as approved also required a favorable vote of a majority of Dorr–Oliver's minority stockholders.

On April 10, Dorr–Oliver issued a proxy statement announcing a May 10 shareholder meeting. At that meeting, the merger was approved by a majority of Dorr–Oliver's minority stockholders. Of the 434,280 minority-owned shares, 346, 287 shares (79.7%) approved the transaction. The merger became effective on May 31, 1979.

Although no Dorr–Oliver stockholders filed an appraisal action under 8 *Del.C.* § 262, plaintiff John Bershad—a minority shareholder of Dorr–Oliver—filed two separate complaints challenging the transaction. Bershad had voted against the merger, but thereafter tendered his 100 shares of Dorr–Oliver stock and received the $2,300 merger consideration. The original complaint alleged (1) that the merger lacked a proper business purpose, and (2) that the $23 per share price paid to the Dorr–Oliver minority was grossly inadequate. In an amended complaint, Bershad alleged that defendants breached their fiduciary duty of complete candor owed to minority shareholders by omitting material facts in Dorr–Oliver's proxy statement, thus making the document false and misleading. Bershad purportedly filed his complaints on behalf of a class of Dorr–Oli-

ver shareholders. However, the class has never been certified.

The Court of Chancery granted summary judgment in favor of the defendants, Curtiss–Wright and Dorr–Oliver. The trial court ruled that under *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983), which eliminated the business purpose rule of *Singer v. Magnavox Co.*, Del.Supr., 380 A.2d 969, 979 (1977) and its progeny, Bershad's challenge to the merger on the basis of an improper purpose clearly failed. *Bershad v. Curtiss–Wright Corp.*, Del.Ch., Nos. 5827 and 5830, slip op. at 8 (March 21, 1983) (Longobardi, V.C.). In reviewing the plaintiff's claims the Vice Chancellor concluded that a full and fair reading of the proxy statement revealed that:

(1) From time to time, Dorr and Curtiss had been approached by other parties expressing an interest in the acquisition of Dorr or all or part of Curtiss' holdings of Dorr common stock.

(2) None of the inquiries by third parties developed to the point where any offer was made.

(3) In the event the proposed merger was not consummated, Curtiss had no present intention of proposing a merger or other amalgamation of Dorr on terms or conditions substantially different from those then proposed.

(4) Curtiss had no present intention of selling its interest in Dorr or later selling Dorr or substantially as, an entity.

(5) Curtiss had a long-term program of purchasing Dorr common stock on the open market and, if the merger were not consummated, Curtiss might continue such purchase in the future.

(6) As a result of reading the proxy statement in its entirety, a reasonable investor would have or, at least

---

4. Three of the seven directors at the meeting were then officers and/or directors of Curtiss–Wright, and a fourth director was a son-in-law of Mr. Berner, the Chairman of Curtiss–Wright, who also was a Dorr–Oliver director. A fifth director was the president and chief executive officer of Dorr–Oliver. On the basis of this

limited record we, therefore, cannot conclude that the foregoing action is entitled to the presumptions that generally attach to decisions of a board whose majority consists of truly outside independent directors. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173, 176 n. 3 (1986).

should have known, that his investment fate was tied directly to the whim of Curtiss.

*Id.* at 12–13.

Considering the above, the trial judge held that a formal recitation of Curtiss–Wright's policy of resisting any sale would not have significantly altered the total mix of information made available to minority shareholders. *Id.* at 14. The Vice Chancellor found that there was no breach of any duty of candor, since the proxy statement sufficiently disclosed all material facts concerning the transaction. There being no dispute of any material fact, summary judgment was granted in favor of the defendants.

## II.

At the outset we agree with the trial court's conclusion that the issues were appropriate for disposition by summary judgment. The Vice Chancellor reasoned:

The Plaintiffs contend that the proxy statement is inadequate because it does not completely disclose Curtiss' policy of discouraging offers from third parties. In this respect, no additional amount of evidence could or need be produced and none is needed to make a legal determination of the adequacy of the proxy statement. Indeed, the issue is as narrowly drawn today as it would be after a complete trial....

*Bershad,* slip op. at 9.

 Our scope and standard of review on the appeal of a summary judgment decision is one of de novo consideration. We review the entire record including the pleadings and issues raised, affidavits, and other evidence in the record, as well as the trial court's opinion. While reviewing those facts in a light most favorable to the nonmoving party, this Court then draws its own conclusions with respect to the facts if the findings of the trial court are clearly wrong. We consider whether there is an issue of fact necessitating a trial on the merits. If none exists, the matter is ripe for summary judgment. *Fiduciary Trust Co. v. Fiduciary Trust Co.,* Del.Supr., 445 A.2d 927, 930 (1982); *Alexander Indus-*

*tries, Inc. v. Hill,* Del.Supr., 211 A.2d 917, 917 (1965). *See, e.g., Dutra de Amorim v. Norment,* Del.Supr., 460 A.2d 511, 514 (1983).

It is well-settled that summary judgment may be granted if, on undisputed facts, the moving party establishes that he or she is entitled to judgment as a matter of law. A motion "must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom." *Vanaman v. Milford Memorial Hospital, Inc.,* Del. Supr., 272 A.2d 718, 720 (1970).

Bershad's success in this matter rests on his claim that Dorr–Oliver's proxy statement was false and misleading since it omitted a reference to an alleged Curtiss–Wright policy to "smother all interest in Dorr out of hand ... [and to] discourage offers for Dorr...." There is no dispute that Curtiss–Wright was uninterested in selling Dorr–Oliver, and there is no dispute as to what Dorr–Oliver said in the proxy statement. Given those circumstances, the only issue is whether the proxy material was false and misleading. Thus, the trial judge properly considered this allegation in the summary judgment context. We are satisfied that a complete trial would not have added anything to the issue.

## III.

 Initially, we address Bershad's contention that Curtiss–Wright breached its fiduciary duty to Dorr–Oliver's minority shareholders by maintaining a strict policy against selling the subsidiary. Plaintiff argues that Curtiss–Wright's decision to cash-out the Dorr–Oliver minority converted the former into "predators" and triggered the application of the fiduciary principles stated in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 182–84 (1985). Bershad contends that the Curtiss–Wright and Dorr–Oliver directors had a duty to obtain the best possible price for Dorr–Oliver's stockholders once the decision to cash-out the minority was made. In essence, plaintiff objects because Curtiss–Wright had no intention to

sell its majority interest in Dorr–Oliver. Moreover, Bershad would impose an affirmative duty on majority shareholders to auction the corporation when seeking to cash-out the minority. We reject that proposition as unsupported by any accepted principle of law.

Stockholders in Delaware corporations have a right to control and vote their shares in their own interest. They are limited only by any fiduciary duty owed to other stockholders. It is not objectionable that their motives may be for personal profit, or determined by whim or caprice, so long as they violate no duty owed other shareholders. *Tanzer v. International General Industries, Inc.*, Del.Supr., 379 A.2d 1121, 1123 (1977). *See Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946, 958 (1985); *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, 1341 (1987). Clearly, a stockholder is under no duty to sell its holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit the minority. *See Pogostin v. Rice*, Del. Supr., 480 A.2d 619, 627 (1984). *See also Panter v. Marshall Field & Co.*, 646 F.2d 271, 288–89 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (policy of resisting all acquisition offers does not violate federal securities law absent deceptive conduct).

Here, Dorr–Oliver was not for sale. As we recently held in *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d at 1345, *Revlon* is inapplicable in that circumstance. Moreover, from Dorr–Oliver's standpoint its directors could not have assumed the role of auctioneers after the merger decision was made. That would have been futile. Curtiss-Wright owned approximately 65% of Dorr–Oliver, and could thwart any effort by Dorr–Oliver directors to auction the company.

In parent-subsidiary merger transactions the issues are those of fairness—fair price and fair dealing. These flow from the statutory provisions permitting mergers, 8 *Del.C.* §§ 251–53 (1983), and those designed to ensure fair value by an appraisal, 8 *Del.C.* § 262 (1983). To adopt Bershad's analysis would require us to ignore both the statutory scheme of the General Corporation Law and well established precedent.

The entire fairness of this transaction must be reviewed under the standards imposed by *Weinberger v. UOP, Inc.*, Del. Supr., 457 A.2d 701 (1983) and *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 937 (1985). Thus, we address Bershad's primary contention—that the Dorr–Oliver proxy statement was false and misleading since it did not fully disclose Curtiss-Wright's policy of discouraging all offers for Dorr–Oliver.

## IV.

### A.

When a majority shareholder stands on both sides of a transaction, the requirement of fairness is "unflinching" in its demand that the controlling stockholder establish the entire fairness of the undertaking sufficient to pass the test of careful scrutiny by the courts. *Rosenblatt v. Getty Oil Co.* Del.Supr., 493 A.2d 929, 937 (1985); *Weinberger v. UOP, Inc.*, Del. Supr., 457 A.2d 701, 710 (1983). As we stated in *Weinberger:*

The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. (citations omitted) However, the test for fairness is not a bifurcated one as between fair dealing and fair price. All aspects of the issue must be examined as a whole since the question is one of entire fairness. However, in a nonfraudulent transaction we recognize that price may be the preponderant considera-

tion outweighing other features of the merger.

*Weinberger*, 457 A.2d at 711.

 The defendants bear the initial burden of establishing the fairness of the merger. However, approval of the merger, as here, by an informed vote of a majority of the minority shareholders, while not a legal prerequisite, shifts the burden of proving the unfairness of the merger entirely to Bershad. Nonetheless, the defendants retain the burden of proving complete disclosure of all material facts relevant to the merger vote. *Weinberger*, 457 A.2d at 703; *Rosenblatt*, 493 A.2d at 937. In evaluating whether defendants satisfied their fiduciary duty of candor, the question is one of materiality. *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 890 (1985). The following materiality standard is applied to the alleged misleading omissions:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills [v. Electric Auto–Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)] general description of materiality as a requirement that 'the defect have a significant *propensity* to affect the voting process.' It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Rosenblatt*, 493 A.2d at 944 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed. 2d 757 (1976)) (emphasis in original).

### B.

 The Dorr–Oliver proxy statement described the Board's approval of the merger, disclosed the Lazard Freres fairness opinion, and highlighted Curtiss–Wright's control of Dorr–Oliver. It also outlined the key provisions of the merger agreement and detailed the shareholders' appraisal rights. Most important to this litigation, however, are two sections of the proxy statement which addressed Curtiss–Wright's intentions and disclosed inquiries concerning the acquisition of Dorr–Oliver:

#### Intentions of Curtiss–Wright

Curtiss–Wright has advised the Company that Curtiss–Wright has no present plans to cause any material changes to be made in the management or the operations of the Company. In addition, Curtiss–Wright also has stated that, in the event that the proposed merger described in this Proxy Statement is not consummated, Curtiss-Wright has no present intention of (i) making a tender offer for shares of Common Stock not owned by it or (ii) proposing a merger or other amalgamation involving the Company on terms and conditions substantially different from those presently proposed. However, Curtiss-Wright has indicated that if the merger is not effectuated, it may purchase shares of Common Stock of the Company in the future, depending on market conditions, economic conditions, interest rates and other factors then deemed to be relevant.

Curtiss–Wright has also advised the Company that Curtiss–Wright has no present intention of selling its interest in the Company or later selling the Company as, or substantially as, an entirety.

\* \* \* \* \* \*

#### Inquiries Concerning the Company

From time to time, the Company and Curtiss–Wright have been approached by other parties expressing an interest in the acquisition of the Company or all or part of Curtiss–Wright's holdings of Common Stock of the Company. None of these inquiries has developed to the point where any offer was made.

Plaintiff asserts that the proxy statement was deficient since it failed to state that the real reason no offer was made was because the defendants squelched any interest generated by prospective purchasers. This omission allegedly "made it impossible [for the shareholders] to test the fairness of the $23 merger price against the values which would have been generated in arm's-length bargaining." Further, "Dorr's minority shareholders were misled into believing that third-party enterprises were not sufficiently interested in Dorr to come forward with attractive offers ..." In summary, plaintiff urges us to find that the omission of a statement that Curtiss–Wright maintained a strict policy that Dorr–Oliver was not for sale (1) was a material fact, (2) was omitted from the proxy statement, and (3) that disclosure of this fact would have significantly altered the total mix of information made available to the shareholders.

Bershad contends that the defendants should have disclosed their actions in discouraging all offers for Dorr–Oliver. To support this argument, plaintiff loosely characterizes certain casual inquiries made by Indian Head, Inc. and Drexel Burnham Lambert, Inc. in 1977 as serious efforts to acquire Dorr–Oliver. However, the facts clearly indicate that representatives of Indian Head and Curtiss–Wright met at the request of Drexel Burnham to discuss the availability of Dorr–Oliver. T.R. Berner, Curtiss–Wright's President and Chief Executive Officer, informed all parties that Dorr–Oliver was not for sale. Further, Indian Head representatives did not have detailed, non-public financial data on Dorr–Oliver and never seriously considered making an offer for the company. In fact, Indian Head's president, Marshall F. Smith, indicated that it was his belief "that we were there, brought together by Drexel Burnham, who was plying their trade, not

very successfully." This 1977 meeting is Bershad's strongest evidence that the defendant's "systematically squelched" all offers out-of-hand.

Curtiss–Wright, of course, had no duty to sell Dorr–Oliver to anyone. As for Bershad's claim that defendants were obligated to disclose their policy of resisting all offers for Dorr–Oliver, we find that the proxy statement adequately informed the minority stockholders that their investment fate was in the hands of Curtiss–Wright. We agree with the Vice Chancellor's conclusion that any formal recitation of this policy would not have significantly altered the total mix of information available to the minority shareholders.

We also find that the defendants were under no duty to disclose the substance of their discussions with Indian Head or any other casual inquiries they received about Dorr–Oliver. Efforts by public corporations to arrange mergers are immaterial under the *Rosenblatt v. Getty* standard, as a matter of law, until the firms have agreed on the price and structure of the transaction. *See Flamm v. Eberstadt*, 814 F.2d 1169, 1174 (7th Cir. 1987); *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 756–58 (3d Cir.1984); *Reiss v. Pan American World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir.1983); *Staffin v. Greenberg*, 672 F.2d 1196, 1204–07 (3d Cir.1982). *Cf. Levinson v. Basic Inc.*, 786 F.2d 741, 746 (6th Cir.1986), *cert. granted*, —— U.S. ——, 107 S.Ct. 1284, 94 L.Ed.2d 142 (1987).[5] Since it is undisputed that: (1) Dorr–Oliver, was not for sale, and (2) no offer was ever made for Dorr–Oliver, the defendants were not obligated to disclose preliminary discussions regarding an unlikely sale. The proxy statement fully met the disclosure standards adopted by us in *Rosenblatt v. Getty*.

---

5. This bright line rule is useful. First, the effect of premature disclosure of merger discussions may be substantial. The probability of completing a merger benefiting all shareholders may well hinge on secrecy during the negotiation process. Second, the benefits of certainty supply additional support for a price and structure standard. Without this bright line standard, it would be very difficult for those responsible individuals to determine when disclosure should be made. Regardless of when disclosure is made, some investors will always argue that disclosure should have been made earlier. *See Flamm v. Eberstadt*, 814 F.2d 1169, 1175–78 (7th Cir.1987).

## V.

We turn to Bershad's contention that *Weinberger* provides a quasi-appraisal remedy for informed shareholders who either tendered their shares or voted in favor of the merger.

■■■ After determining that the shareholder vote was an informed one, the Vice Chancellor dismissed the claims of any stockholder who either voted in favor of the merger, or like Bershad, accepted its benefits. Bershad claims that *Weinberger* preserves a "quasi-appraisal" remedy for *all* Dorr–Oliver minority stockholders challenging the fairness of a cash-out merger occurring on or before February 1, 1983. The thrust of *Weinberger* is to protect those rights of minority stockholders which have been tainted by an element of unfairness. *Weinberger*, 457 A.2d at 703, 711–15. *See also Rabkin v. Phillip A. Hunt Chemical Corp.*, Del. Supr., 498 A.2d 1099, 1105–08 (1985). However, when an informed minority shareholder either votes in favor of the merger, or like Bershad, accepts the benefits of the transaction, he or she cannot thereafter attack its fairness. *Trounstine v. Remington Rand, Inc.*, Del. Ch., 194 A. 95, 99 (1937). Since Bershad tendered his shares and accepted the merger consideration, he acquiesced in the transaction and cannot now attack it.

■■■ This ruling as to Bershad does not, however, necessarily end the matter. The suit also was purportedly filed as a class action on behalf of former Dorr–Oliver stockholders who neither voted in favor of the merger nor tendered their shares. Since suit was filed on March 14, 1979, and the merger became effective on May 31, 1979, such stockholders technically come within the "window" provided by *Weinberger*,[6] following our announcement of that decision on February 1, 1983. Accordingly, the case will be remanded to the Court of Chancery for disposition of the class action issue and any proper claims of shareholders who did not vote in favor of the merger or tender their shares.

Finally, we note that Dorr–Oliver was subsequently sold by Curtiss–Wright and is now a subsidiary of Kennicott, Inc. No claim has been stated against Dorr–Oliver, and we find that it is not a necessary party to the fairness issue and should be dismissed from the case on remand.

Accordingly, the judgment of the Court of Chancery is AFFIRMED. The matter is REMANDED for further proceedings consistent herewith.

**6.** To protect the interests of such stockholders, we stated:

> Obviously, there are other litigants, like the plaintiff, who abjured an appraisal and whose rights to challenge the element of fair value must be preserved. Accordingly, the quasi-appraisal remedy we grant the plaintiff here will apply only to: (1) this case; (2) any case now pending on appeal to this Court; (3) any case now pending in the Court of Chancery which has not yet been appealed but which may be eligible for direct appeal to this Court; (4) any case challenging a cash-out merger, the effective date of which is on or before February 1, 1983; and (5) any proposed merger to be presented at a shareholders' meeting, the notification of which is mailed to the stockholders on or before February 23, 1983. Thereafter, the provisions of 8 *Del.C.* § 262, as herein construed, respecting the scope of an appraisal and the means for perfecting the same, shall govern the financial remedy available to minority shareholders in a cash-out merger. Thus, we return to the well established principles of *Stauffer v. Standard Brands, Inc.*, Del. Supr., 187 A.2d 78 (1962) and *David J. Greene & Co. v. Schenley Industries, Inc.*, Del.Ch., 281 A.2d 30 (1971), mandating a stockholder's recourse to the basic remedy of an appraisal. *Weinberger*, 457 A.2d at 714–15.