SMITH v. N.C. MOTOR SPEEDWAY, 1997 NCBC 5

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | IN THE GENERAL COURT OF JUSTICE |
| COUNTY OF MECKLENBURG | ) | SUPERIOR COURT DIVISION |
| | | 97-CVS-9961 |
| O. BRUTON SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **OPINION AND ORDER** |
| NORTH CAROLINA MOTOR | ) | |
| SPEEDWAY, INC., *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

{1} This case has been assigned to the undersigned Special Superior Court Judge for Complex Business Cases pursuant to the October 27, 1997 order of the Chief Justice. The matter is before the Court on five motions: plaintiff's motion for a preliminary injunction and two motions to add parties, and defendants' motions to dismiss. (Defendants are in two groups; each group has moved to dismiss.) Notwithstanding the fact that suit was filed on August 5, 1997, expedited and extensive discovery has taken place. The parties have thoroughly and fully briefed all of the pending motions. The Court heard argument on all pending motions from counsel for all parties on November 5, 1997 in Mecklenburg County.

{2} For the reasons set forth below, the Court will first deny plaintiff's motion for a preliminary injunction, a decision which the Court has reached after reviewing the exhibits, affidavits and deposition excerpts submitted, in addition to the briefs and argument. The Court will also grant the defendants' motions to dismiss pursuant to Rule 12(b)(6), which requires that the Court consider only the allegations in plaintiff's complaint and evaluate those allegations for their legal sufficiency. Because of the resolution of these motions, the Court will not address plaintiff's motions to add parties or defendants' objections to plaintiff's standing and to plaintiff's discovery responses.

{3} One issue is determinative of both plaintiff's motion for preliminary injunction and defendants' motion to dismiss for failure to state a claim. Does a majority shareholder have a fiduciary duty to minority shareholders to "auction off" the company or otherwise obtain the highest possible value for the minority shareholders' interests once the majority shareholder decides to sell its controlling interest or engage in a cash out merger? The Court concludes that no such fiduciary duty is imposed on majority shareholders under North Carolina law.

## I. PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

A. <u>Findings of Fact</u>.

{4} 1. Bruton Smith, the plaintiff, is a citizen and resident of Charlotte, Mecklenburg County, North Carolina. He owns approximately 25% of the stock in North Carolina Motor Speedway ("NCMS"). He is also the majority owner, Chairman and CEO of Speedway Motorsports, Inc. ("SMI") which owns five racetracks which host eight NASCAR Winston Cup races each year.

{5} 2. Defendant NCMS is a North Carolina corporation with its principal place of business in Rockingham, Richmond County, North Carolina. Lindsay G. DeWitt, a co-founder of NCMS in 1965, was the company's majority shareholder until his death in October 1990. Upon his death, his widow, Mrs. Carrie DeWitt, became NCMS's majority shareholder.

{6} 3. NCMS's principal physical asset is a one-mile race track located 10 miles north of Rockingham. The company's primary business is the operation of the track, which now hosts two annual NASCAR Winston Cup Series races, as well as other motor sports events.

{7} 4. NCMS is and always has been a privately-held company. NCMS currently has approximately 100 shareholders.

{8} 5. Defendant Penske Motorsports, Inc. ("PMI") is a Delaware corporation with its principal place of business in Detroit, Michigan and does business in North Carolina. Defendant Penske Acquisition, Inc. ("PAI") is a North Carolina corporation, with a registered office in North Carolina. Defendant PSH Corp. ("PSH") is a Delaware corporation, with its principal place of business in Detroit, Michigan, and does business in North Carolina.

{9} 6. Defendant Walter Czarnecki is a citizen and resident of Bloomfield Hills, Michigan; defendant Richard J. Peters is a citizen and resident of Dundee, Michigan; and defendant Robert Kurnick, Jr. is a citizen and resident of Detroit, Michigan. Czarnecki and Kurnick are officers of PMI, and Peters is the former President and CEO of PMI.

{10} 7. Defendants Carrie B. DeWitt, Nancy DeWitt Daugherty, and Jo DeWitt Wilson are residents of Richmond County, North Carolina.

{11} 8. Czarnecki, Peters, Kurnick, DeWitt, Daugherty, and Wilson are members of the Board of Directors of NCMS. Wilson is president of NCMS, Daugherty is its secretary, and DeWitt is chairperson of the Board of NCMS.

{12} 9. There are approximately 2,236,830 shares of outstanding stock in NCMS. From 1995 to 1997, plaintiff and SMI made a number of proposals to purchase the 1,461,378 shares in NCMS owned at that time by DeWitt. Having declined those proposals, on April 1, 1997, DeWitt granted to PMI the right to obtain an irrevocable proxy on any matter, including a merger between PMI and NCMS. On April 9, 1997, DeWitt further granted PMI an option to purchase all of her 1,461,378 shares in NCMS, amounting to 65% of the outstanding stock of NCMS. On May 15, 1997, PMI exercised that option and purchased DeWitt's stock. The form of the transaction between PMI and DeWitt was an exchange of stock, and the exchange ratio reflected a value of $18.61 per share of NCMS common stock at a $30 per share value of PMI common stock.

{13} 10. PMI, on or about April 1, 1997, proposed to merge NCMS and PMI. The offer, as subsequently amended on April 9, provided that PMI would pay $18.61 cash per NCMS share or exchange PMI stock worth a like amount for each share of NCMS stock.

{14} 11. On April 2, 1997, SMI, the company plaintiff controls, proposed to merge NCMS and SMI for $23 per share in cash or SMI stock. After PMI and DeWitt entered into their stock option agreement on April 9, SMI increased its offer to $32 per share of NCMS stock.

{15} 12. On April 9, 1997, the NCMS Board of Directors established a special committee of the Board for the purpose of evaluating the offers of PMI and SMI to acquire ownership of NCMS by means of the mergers each company had proposed. The special committee engaged the law firm of Kennedy Covington Lobdell & Hickman as independent counsel and the firm of Interstate/Johnson Lane Corporation as financial advisor to assist the committee in its considerations.

{16} 13. The special committee's procedure included negotiations with PMI and SMI. The negotiations with PMI produced at least two improvements to PMI's proposal to the NCMS minority shareholders. First, PMI increased its offer to the minority shareholders to $19.61 per NCMS share, either in cash or in shares of PMI stock. In addition, in the event that any minority shareholder holding more than 5% of NCMS's shares (i.e., Bruton Smith) secured a higher price for his shares in a dissent and appraisal proceeding or, if PMI sold NCMS for a higher price within a year of the merger, PMI agreed to pay any

difference in price to all minority shareholders.

{17} 14. On July 2, 1997, the special committee issued its report to the NCMS Board. Among the committee's conclusions were that PMI's merger proposal "is fair to the shareholders of [NCMS]" and that the PMI merger proposal was "above the range of values that Interstate/Johnson Lane had concluded was appropriate." The special committee likewise concluded that PMI's agreement to provide the price protection described in the preceding finding was a "significant enhancement" of its original merger proposal.

{18} 15. Also in its report, the special committee recognized that SMI's offer contained a higher monetary value than PMI's proposal, but that SMI's merger proposal would never succeed without PMI's affirmative vote of its majority of NCMS shares. Immediately prior to its recommendations, the special committee observed that "nothing in this conclusion is intended to suggest that the [NCMS] board could not determine in good faith that PMI's stated proposal that it would not vote in favor of the SMI proposal would make submission of the SMI proposal futile." The committee went on to observe that submitting both proposals would avoid any doubt as to the capacity in which PMI was acting if it did choose to exercise its voting power as a majority shareholder of NCMS to prevent shareholder approval of the SMI proposal.

{19} 16. The special committee recommended that, if SMI provided contractual assurances that it would complete a tender offer for minority shares at a price of $28 per share if the NCMS shareholders rejected its merger proposal, the Board should submit the SMI merger proposal to the NCMS shareholders. If SMI failed to provide such contractual assurances, the special committee recommended that both the SMI and PMI proposals be submitted to the shareholders and that the SMI proposal be approved, but that the PMI proposal be approved if the SMI proposal was not. SMI failed to give the contractual assurances the special committee specified.

{20} 17. When the NCMS Board convened on August 5, 1997, the directors were presented with the August 1, 1997 letter of Roger Penske, chairman of the board of PMI. In this letter addressed to Jo DeWitt Wilson, the president of NCMS, Roger Penske made unambiguously clear that PMI would vote all of its majority shares in opposition to any SMI proposal "made or to be made" to acquire NCMS. The board evaluated the special committee's report and Mr. Penske's letter on behalf of PMI before voting on whether to send forward to the NCMS shareholders the merger proposals.

{21} 18. By a vote of seven to three at their August 5 meeting, the NCMS directors decided to submit only the PMI merger to the NCMS shareholders. The three "no votes" cast were by plaintiff, the president of SMI, and SMI's chief financial officer, who are the three directors plaintiff has elected to the NCMS board under cumulative voting procedures.

{22} 19. Based on the NCMS board resolutions adopted at the August meeting, it is apparent that the NCMS directors addressed several issues important to the NCMS minority shareholders. As the special committee had recognized in its report, an enormous tax liability could arise for PMI if it did not conclude its merger transaction with NCMS prior to the end of 1997. With one of its briefs defendants submitted the affidavit of William M. Goldstein, a tax advisor to PMI who had been providing advice with respect to the proposed merger with NCMS. Mr. Goldstein's analysis demonstrated that, if the proposed merger does not close during 1997, it would create what he described as "disastrous tax consequences" amounting to a tax liability of several million dollars. This result will not occur, however, if the merger between PMI and NCMS is completed before the end of the year.

{23} 20. Also as reflected in the August 5 resolutions of the NCMS directors, the NCMS board stated that submitting the SMI proposal to the shareholders could result in a complete withdrawal of the PMI proposal to the minority shareholders, a development that would expose them to what the special committee had described as the "risk that the shareholders . . . would indefinitely maintain an illiquid investment, and the opportunities for liquidity at a price at least equivalent to that offered by the PMI

proposal may not again arise in the foreseeable future."

{24} 21. According to his complaint, the plaintiff seeks only equitable relief in this action: an order of rescission of the agreement by which DeWitt sold her stock to PMI; a declaration that the transaction styled "Option and Voting Agreement" between DeWitt and PMI, including DeWitt's sale of her NCMS shares to PMI, is void; and a preliminary and permanent injunction prohibiting plaintiffs from submitting the PMI merger proposal to the NCMS shareholders, and from approving any merger or sale of NCMS for "less than the highest price." The shareholders meeting is set for early December, 1997.

{25} 22. In deciding to sell to PMI rather than SMI, the DeWitt family considered other factors in addition to price. Jo Wilson, Mrs. DeWitt's daughter, testified: "Our primary objectives in selling my mother's shares were to obtain a satisfactory price for my mother's ownership interest and to sell to a buyer who we believed to be the best business partner for us and the best caretaker of NCMS." PMI agreed to continue the company's current capital expenditure plan and represented that it had no intention to move any NASCAR sanctioned race from the track.

B. Conclusions of Law

{26} 1. A preliminary injunction is "an extraordinary remedy and will not be lightly granted." *Travenol Laboratories, Inc. v. Turner,* 30 N.C. App. 686, 692, 228 S.E.2d 478, 483 (1976). The plaintiff has the burden to establish his right to a preliminary injunction. *Adams v. Beard Development Corp.,* 116 N.C. App. 105, 109, 446 S.E.2d 862, 865 (1994). To do so, he must demonstrate both (i) the likelihood of success on the merits and (ii) that he is likely to sustain irreparable harm unless the injunction is issued or that an injunction is necessary to protect his rights during the course of the litigation. *Id.* Moreover, the Court must exercise its discretion by weighing the equities and the advantages and disadvantages to the parties. *Id.*

{27} 2. Here, the plaintiff has failed to meet his burden on either element necessary for a preliminary injunction. In addition, the equities weigh strongly against issuing the injunction the plaintiff seeks.

　　　(i) *Plaintiff has no likelihood of success on the merits.*

{28} 3. When Carrie DeWitt sold her NCMS shares to PMI, she was acting as a shareholder, making the decision a shareholder must be free to make under our system of corporate laws. Accordingly, she had the right to sell her stock to the purchaser of her choice free from any obligation to obtain the highest price for the minority shareholders in doing so. The holding and legal principles articulated by the Delaware Supreme Court in *Bershad v. Curtiss-Wright Corp.,* 535 A.2d 840, 845 (Del. 1987) are the principles that the Court believes to be sound and worthy of adoption in North Carolina. In the *Bershad* decision, a unanimous Delaware Supreme Court concluded under factual circumstances very similar to the present circumstances that the minority shareholders' attempt to "impose an affirmative duty on majority shareholders to auction the corporation when seeking to cash-out the minority" was "unsupported by any principle of law." 535 A.2d 840, 845.

{29} 4. In addition, and also with instruction for the present case, the Delaware Supreme Court determined in *Bershad* that it made no practical sense for the board of the target company (the counterpart of NCMS here) to imagine some course other than merger with the majority shareholder (the counterpart of PMI here) would ensue. The Court made the pointed and fully applicable remark for this case: ["it] would have been futile" for the board to have assumed the role of auctioneers after the merger decision was made. The majority shareholder "could thwart any effort by [the target company's directors] to auction the company." *Id.*

{30} 5. In *Bershad* and in the subsequent decision by the Delaware Chancery Court, *Kleinhandler v. Borgia,* 1989 WL 76299, *4 (Del. Ch. 1989), the Delaware courts specifically addressed the line of authority on which plaintiff relies here, the *Revlon* and *Paramount* decisions and found those decisions inapposite. *Revlon v. McAndrews & Forbes Holdings, Inc.* 506 A.2d 173 (Del. 1986); *Paramount*

*Communications, Inc. v. QVC Network, Inc.,* 537 A.2d 34 (Del. 1994). Plaintiff's attempted reliance on *Revlon* and *Paramount* is not well taken because the action of Mrs. DeWitt in choosing to sell her shares to PMI does not trigger the application of the fiduciary principles stated in these cases. *Accord Swinney v. Keebler Co.,* 480 F.2d 573, 577 (4th Cir. 1973) ("Generally, the owner of corporate stock may dispose of his shares as he sees fit. A dominant or majority stockholder does not become a fiduciary for other stockholders merely by owning stock. In selling their stock, stockholders necessarily act for themselves and not as trustees for other stockholders."); *Glass v. Glass ,* 321 S.E.2d 69, 74 (Va. 1984) ("In general, shareholders may dispose of their stock as they see fit."). Neither *Revlon* nor *Paramount* involved the sale of a majority shareholder's interest. Those cases held that a Board of Directors of a publicly traded company had a duty to obtain the highest price for all of the shareholders once the company had been "put into play." The majority owner of a privately held company does not "put the company in play" when it decides to sell its stock. The majority owner is free to consider factors other than the highest price for the minority shareholders. That is particularly true where, as here, an ongoing business relationship is contemplated between the buyer and seller.

{31} 6. Applying the reasoning in *Bershad and Kleinhandler,* once Mrs. DeWitt sold her shares to PMI, the Board of Directors of PMI had no duty to act as if an auction would take place and no power to require one. The NCMS board was entitled to and reasonably relied upon PMI's declaration (by its August 1, 1997 letter to NCMS's president**)** that PMI, the majority shareholder, would not vote for any merger with SMI. It is undisputed that PMI, like the majority shareholder in *Bershad,* would not sell its interest in NCMS stock. No less than four witnesses, all officers or former officers of PMI, testified that PMI had no intention to sell its stock in NCMS, and that PMI had bought its interest in NCMS solely as an investment. Plaintiff has forecasted no evidence whatsoever that suggests this evidence be put into any doubt, much less to dispute it in any respect.

{32} 7. Even if the clock were turned back, as plaintiff prefers, and Mrs. DeWitt's choice to sell to PMI were unwound, it would not improve plaintiff's position in any material respect. Mrs. DeWitt would then be free, under North Carolina law, to proceed with her own plan to cash out the minority shareholders. If she did so, Mrs. DeWitt would be free to sell NCMS, 100% of it, to PMI. Thus, the equitable relief plaintiff desires -- even if it were grounded in legal precedent -- would not accomplish the goal plaintiff has asserted in his complaint.

{33} 8. Plaintiff has full access to the dissent and appraisal procedure provided in N.C. Gen. Stat. §55-13-01 *et seq.* It is a comprehensive procedure the General Assembly established to protect minority shareholders in transactions such as PMI has proposed. Plaintiff has a remedy designed to assure a fair price for his shares if he disagrees with the terms of PMI proposal. If plaintiff proves the fair value of his shares is $32.00, he will be entitled to recover the difference in that value and the $19.61 offered by PMI.

{34} 9. By way of amendment in 1990, the General Assembly reinforced the principle of exclusiveness in the dissent and appraisal process, a principle that had been recognized under prior case law. This amendment made clear that the exclusivity provision applies to cash-out mergers. N.C. Gen. Stat. §55-13-02(b) N.C. Commentary (1990); RUSSELL M. ROBINSON II, ROBINSON ON NORTH CAROLINA CORPORATION LAW §27-7 at 534 (5th Ed. 1995).

{35} 10. It is equally clear that the dissent and appraisal procedure does not provide the exclusive remedy where a transaction is determined to be "unlawful or fraudulent," and that a breach of fiduciary duty is subsumed within these terms. N.C. Gen. Stat. § 55-13-02(b) and comment. But these exceptions have no application to this case. The conduct alleged in the complaint -- conduct now fully examined during the depositions plaintiff's counsel has taken of all the defendants -- does not constitute a breach of fiduciary duty or fraud, because a majority shareholder has the right to sell her own stock to whomever she chooses and the NCMS Board had the right to rely on PMI's statement of intent not to sell its ownership interest. Further, the plaintiff has failed to present or forecast any evidence whatever to indicate there has been any breach of fiduciary duty. According to the statute, this leaves the appraisal procedure as plaintiff's exclusive remedy.

{36} 11. Reinforcing the Court's view with respect to dissent and appraisal is the plaintiff's own repeated declarations in his complaint that he desires "the highest possible price." All of his contentions are easily traced to his difference with the merger consideration offered by PMI. Likewise, when he testified, plaintiff acknowledged that he would have no complaint if SMI's merger proposal of $32 per share was approved and that, if PMI's merger goes through, the only damages he would incur would be the difference between PMI's offer and SMI's offer. Moreover, when asked in his deposition if the alleged breach of fiduciary duties in this case was "a matter of price," Smith responded "Of course . . . . The director and majority shareholder had the obligation and the fiduciary duty to get the highest price for this stock." (Smith dep. at 275-76.) Other testimony, including from the president of SMI, fully confirmed that, however couched, the dispute plaintiff has brought to this Court is actually a dispute over the price that has been offered for his minority interest in NCMS.

{37} 12. In a case in which the *only* relief sought by the plaintiff is equitable relief, the consistent acknowledgments of the plaintiff and all the indications of his complaint point to no reason to award relief. When money damages -- the difference in the merger consideration provided in the respective merger proposals -- would make plaintiff whole, a legal remedy is sufficient. As can all other minority shareholders of NCMS, plaintiff can invoke the dissent and appraisal procedure our General Assembly has provided; it is at least an adequate remedy for the circumstances presented here or the General Assembly's overall design for protecting minority shareholders would hold no meaning. A court of equity cannot award injunctive relief in the face of this legislation and the evidence on this record.

{38} 13. Plaintiff also has argued that PMI's merger proposal failed to meet the test of "entire fairness" set out by the Delaware Supreme Court in *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del. 1983). The Court need not decide now whether the *Weinberger* "entire fairness" test or some lesser standard applies in North Carolina, because it is plain that PMI's merger proposal meets *Weinberger's* test of entire fairness, both as to "fair process" and "fair price."

{39} 14. First, as to the fairness of the process, the Court finds that fairness was ensured by the NCMS Board's creation of an independent special committee to evaluate PMI's proposal and the committee's engagement of counsel and a financial advisor to aid them in that process. The objectivity of the special committee and the seriousness with which it undertook its duties were manifested by the negotiations the special committee conducted with PMI on behalf NCMS. Indeed, those negotiations resulted in important enhancements to PMI's offer that will benefit all of the minority shareholders. There is no evidence that suggests that the special committee operated with anything other than the utmost fairness.

{40} 15. As to the fairness of the price in PMI's proposal, the special committee noted that it was not only "fair," but was actually above the range of values that the committee's financial advisor had deemed appropriate. Plaintiff presented no evidence that the PMI offer was unfair to the minority shareholders of NCMS. The existence of a higher offer by SMI does not establish the unfairness of PMI's proposal. *See Mendel v. Carroll,* 651 A.2d 297, 305 (Del. Ch. 1994) (because a minority shareholder must pay a premium above market price for a controlling block of shares, the minority's higher price "does not, logically, support an inference" that the majority shareholder's lower offer is not fair).

{41} 16. The Board's conclusion to send forward only the PMI proposal is also consistent with overall fairness in these particular circumstances. As the Board evaluated whether to send forward either or both the SMI and PMI proposals, it also considered that submission or SMI's proposal would not only be a futile act, but could lead to the withdrawal of PMI's offer and the enhancements the special committee had negotiated, all to the detriment of the minority shareholders.

{42} 17. Accordingly, for the above reasons, the Court concludes that plaintiff has failed to demonstrate any likelihood of success on the merits. In fact, as appears below, his case will be dismissed for failure to state a claim.

(ii) *An injunction is not necessary to prevent irreparable harm or to protect plaintiff's rights.*

{43} 18. Plaintiff has provided no evidence, nor any forecast of same, that he has sustained or will sustain any irreparable harm, also a prerequisite to securing the equitable remedies his complaint demands. Our state's precedent clearly requires that, to secure a preliminary injunction, he not only assert irreparable harm but that he demonstrate such harm with particularity. Plaintiff has not done so. Further, his admission that he would have no complaint if the SMI proposal of $32 per share were approved is an admission that he will not sustain any irreparable harm, but that an award of money damages would provide him full relief. *See United Telephone Company of the Carolinas, Inc. v. Universal Plastics, Inc.,* 287 N.C. 232, 236, 214 S.E.2d 49, 52 (1975); *Board of Light and Water Commissioners v. Parkwood Sanitary District,* 49 N.C. App. 421, 423, 271 S.E.2d 402, 404 (1980)*, disc. rev. denied,* 301 N.C. 721, 276 S.E.2d 282 (1981).

{44} 19. An injunction to prevent the consummation of the merger between PMI and NCMS is not necessary either to prevent irreparable harm or to protect plaintiff's rights. As reviewed above, the dissent and appraisal procedure for minority shareholders, such as plaintiff, who object to the price offered in a merger, including a merger for cash, is the governing remedy for this plaintiff. N.C. Gen. Stat. § 55-13-02. The statutory appraisal procedure will ensure that plaintiff receives "fair value" for his NCMS stock, the only price to which he is entitled.

{45} 20. Not only is the appraisal remedy procedure an adequate remedy for the plaintiff, it is also his exclusive remedy, because PMI's merger proposal is neither "unlawful" nor "fraudulent" for the reasons described above. N.C. Gen. Stat. § 55-13-02(b).

(iii) *The equities weigh strongly against issuing a preliminary injunction.*

{46} 21. In addition to the plaintiff's failure to meet either element necessary for a preliminary injunction, the Court finds that other considerations weigh strongly against granting plaintiff's motion for such relief.

{47} 22. First, as discussed above, PMI has demonstrated, by means of an unchallenged affidavit, that an injunction could cause highly significant tax liability if its merger with NCMS is not consummated before December 31, 1997.

{48} 23. For that reason, the Court also finds that an injunction could actually place the minority shareholders in a *worse* position than they now occupy. As the NCMS Board recognized, consistent with the special committee's observation, there is a risk that PMI would decide to withdraw its merger proposal if delay threatens the tax-free status of its transaction. In that event, the minority shareholders run the risk of never having the ability to sell their stock for the same price that PMI now offers. Thus, an injunction may well prove to be contrary to the best economic interests of the minority shareholders.

{49} 24. Likewise, if an injunction stopped the PMI merger with NCMS, plaintiff's "gain" is illusory**.** PMI has made crystal clear it will not vote in favor of a merger with SMI. The court is not empowered to order PMI to put up its NCMS shares for auction. An injunction for plaintiff would create a stalemate, nothing more.

{50} 25. Because of the risk of very significant ramifications if the Court delays PMI's merger with NCMS, the disadvantages to PMI and the minority shareholders outweigh any advantages that the plaintiff would receive from the issuance of a preliminary injunction.

{51} Accordingly, for all of the above reasons, plaintiff's motion for a preliminary injunction is **DENIED.**

## II. DEFENDANTS' MOTIONS TO DISMISS

{52} All of the defendants have moved to dismiss this action, pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. In evaluating this motion, the Court will take the allegations of the complaint as true to determine whether the complaint is "sufficient to satisfy the elements of at least some recognized claim." *Poston v. Poston,* 112 N.C. App. 849, 850, 436 S.E.2d 854, 855 (1993).

{53} Plaintiff's complaint raised a question whether PMI had actually purchased DeWitt's shares, although plaintiff acknowledged that PMI had publicly stated that it had exercised the purchase option it had obtained for DeWitt's interest (Compl. at para. 22). The record the Court has considered on plaintiff's motion for a preliminary injunction eliminates any doubt that plaintiff could have ever held with respect to the current ownership of a majority interest in NCMS. In addition, plaintiff's oral argument took as a given that PMI had been the majority shareholder of NCMS since May 15, 1997. The Court observes, nonetheless, that its ruling on defendants' Rule 12(b)(6) motion need not and does not rely upon anything beyond the complaint's allegations inasmuch as the legal principles the Court has applied fully obtain whether DeWitt has transferred her majority interest in NCMS to PMI or is only poised to do so. Likewise, plaintiff has frequently relied in his complaint on the special committee's report to make his allegations, and that committee specifically recognized that, as of May 15, 1997, PMI became owner of 69.9% of NCMS's common stock. *See Robertson v. Boyd,* 88 N.C. App. 437, 440, 363 S.E.2d 672, 675 (1988) (concluding that, on a 12(b)(6) motion, the court can property evaluate documents that are the subject of plaintiff's claims and are referred to in the pleadings.)

{54} 1. As plaintiff acknowledged to the Court at the hearing on this matter, each of the plaintiff's four causes of action is founded on a single legal contention: that defendants had a fiduciary duty to obtain the "highest possible price" for all the shareholders when Mrs. DeWitt agreed to sell her stock to PMI. Indeed, a thorough review of the complaint yields this conclusion foursquare.

{55} 2. Specifically, plaintiff's first and second claims for relief allege, respectively, that the NCMS directors and majority shareholder owe the minority shareholders a fiduciary duty "to obtain the highest possible price" for all of the shareholders' stock. (Compl. at paras. 27, 32.) Similarly, the plaintiff's claims for unfair and deceptive trade practices and aiding and abetting breach of fiduciary duty fully depend on a breach of the fiduciary duty asserted in the first two claims. (Compl. at paras. 29, 45.)

{56} 3. Plaintiff's premise -- that a majority shareholder has an obligation to obtain the highest possible price for other shareholders when selling her own controlling block of stock -- fails to find support in any legal precedent plaintiff has cited or the Court has seen. Indeed, well-reasoned precedent is plainly against plaintiff's premise.

{57} 4. As a general rule, shareholders, including majority shareholders, do not owe fiduciary obligations to other shareholders when selling their own stock in a corporation. The Delaware Supreme Court held that shareholders "have a right to control and vote their shares in their own interest. They are limited only by any fiduciary duty owed to other stockholders. It is not objectionable that their motives may be for personal profit, or determined by whim or caprice, so long as they violate no duty owed other shareholders." *Bershad v. Curtis-Wright Corp.,* 535 A.2d 840, 845 (Del. 1997); *see also, e.g., Swinney v. Keebler,* 480 F.2d 573, 577 (4th Cir. 1973) ("Generally, the owner of corporate stock may dispose of his shares as he sees fit **. . . .** In selling their stock, stockholders necessarily act for themselves and not as trustees for other stockholders.").

{58} 5. By agreeing to sell her stock to PMI, Mrs. DeWitt was a shareholder acting only as a shareholder. As such, she had no duty to obtain the highest price for plaintiff's stock when selling her stock to PMI.

{59} 6. The cases relied upon by the plaintiff do not apply to a shareholder's sale of her stock, including the sale of a controlling block of stock. For example, the Delaware Supreme Court held in *Revlon v. McAndrews & Forbes Holding, Inc.***,** 506 A.2d 173 (Del. 1986), that a board of directors of a corporation has a duty to "auction" the corporation when the board is taking action on behalf of the corporation resulting in a change of control of the corporation. *Id.* at 181-82. Similarly, *Gaines v. Long Mfg. Co.,* 234 NC. 340, 344, 67 S.E.2d 350, 353 (1951), also relied upon by plaintiff, addressed the fiduciary duty of a majority shareholder who is directing the "action of the corporation" involving "property of the corporation." Because Mrs. Dewitt was neither taking action on behalf of NCMS and the other shareholders nor acting with corporate property in selling her own stock to PMI, the duties applied in *Revlon, Gaines* and the other cases plaintiff cites are not implicated, much less breached. Mrs. DeWitt was

choosing to sell a personal, not a corporate, asset when she chose to sell her shares to PMI.

{60} 7. The bright-line distinction between the right of a controlling shareholder to make decisions about her own shares and the duties of a board of directors and majority shareholder acting on behalf of the corporation has been described by a noted commentator as follows:

> A closely related question [to the duties of a majority shareholder who takes on the functions and responsibilities of the board of directors] is whether and to what extent the owners of a controlling block of shares, regardless of whether it represents a majority of the shares, owe an obligation to the corporation and the remaining shareholders in selling that block. The numerous litigated cases from other jurisdictions involving the sale of control stock indicate that control is not a "corporate asset" for this purpose and that its sale, even at a premium, is not a breach of fiduciary duty in the absence of some evident purpose of "looting" or other questionable motive; but the controlling shareholder may be liable to the other shareholders if he has reason to believe the buyer intends to deal unfairly with them or if he himself deals unfairly with them.

> A distinction must be drawn between saying that corporate control is not a corporate asset in allowing a controlling shareholder to sell for whatever price he may honestly obtain and saying it is a corporate asset in holding that the directors have a right, and maybe even a duty, to protect it for the benefit of all shareholders.

RUSSELL M. ROBINSON II, ROBINSON ON NORTH CAROLINA CORPORATION LAW § 11.4 at 239 and n.9 (5th ed. 1995).

{61} 8. If the theory the plaintiff's complaint depends upon were adopted in this state, North Carolina would stand alone in imposing such restrictions upon a majority shareholder seeking to sell her shares. Such a rule would create, at a minimum, significant uncertainty for businesses and shareholders in this state and would infringe upon a shareholder's time-honored right to make decisions with respect to her own property. Such a rule would create enormous uncertainty between potential buyers and sellers and limit their ability to contract. It would, in effect, transfer "control" to minority shareholders anytime a majority shareholder wanted to sell her interests.

{62} 9. Moreover, upon its acquisition of Mrs DeWitt's stock, PMI, the majority shareholder of NCMS, has no duty to "auction" the corporation to obtain the "highest possible price" for the stock of the remaining minority shareholders. The Delaware Supreme Court has rejected that exact proposition "as unsupported by any principle of law." *Bershad*, 535 A.2d at 845. In addition, the Delaware Chancery Court ruled in *Kleinhandler v. Borgia,* 1989 WL, 76299, *4 (Del. Ch. 1989), that minority shareholders were not entitled to "obtain the highest price for their stock in a cash-out merger because such a claim "is premised upon an interpretation of *Revlon* that has been rejected by our courts."

{63} 10. Because, as the Complaint alleges, PMI intends to vote its share in favor of its own lower merger proposal, the NCMS Board also has no duty to "auction" NCMS before recommending the PMI proposal. *Bershad,* 535 A.2d at 845 (holding that board had no duty to "assume[] the role of auctioneers" once majority shareholder decided to cash out the minority shareholders). Any attempt to "auction" NCMS would be futile. *Id.*

{64} 11. The plaintiff's various allegations of "secrecy" and "conspiracy" relating to Mrs. DeWitt's negotiations cannot rescue plaintiff's complaint from dismissal. A lawful transaction does not become unlawful because it is negotiated in confidence or secrecy.

{65} 12. In sum, assuming, as the Court has assumed, that all of the allegations in plaintiff's complaint are true, plaintiff has failed to state a viable cause of action. As a matter of law, neither Mrs. DeWitt nor any of the other defendants had an obligation to obtain the highest price for the minority shareholders when Mrs. DeWitt agreed to sell her controlling block of stock to PMI. Similarly, PMI, as the majority

shareholder, and the NCMS directors do not have a duty now to "auction" NCMS before purchasing the stock of the remaining minority shareholders.

{66} 13. Plaintiff has failed to state a claim upon which relief may be granted.

{67} Accordingly, for the above reasons, defendants' motions to dismiss are **GRANTED.**

This 12th day of November, 1997.