Smith v. Lewis, 2012 NCBC 8.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05 CVS 17912

TROY M. SMITH,                                )
                              Plaintiff        )
                                              )
              v.                              )
                                              )
DOUGLAS J. LEWIS, LINDA P. LEWIS,              )
LFM OPERATING COMPANY, LLC (now               )
dissolved) and LEWIS FINANCIAL                )
MANAGEMENT, LLC,                              )
                              Defendants       )

**ORDER AND OPINION ON
CROSS MOTIONS FOR
SUMMARY JUDGMENT**

THIS CAUSE, designated a complex business case by Order of the Chief Justice

of the North Carolina Supreme Court, pursuant to Rules 2.1 and 2.2 of the General

Rules of Practice for the Superior and District Courts, and assigned to the undersigned

Chief Special Superior Court Judge for Complex Business Cases, is before the court

upon the parties' respective motions for summary judgment (the "Motion(s)") pursuant to

Rule 56, North Carolina Rules of Civil Procedure ("Rule(s)"); and

After considering the arguments, briefs, other submissions of counsel and

appropriate matters of record, the court CONCLUDES that the Motions should be

GRANTED in part and DENIED in part, for the reasons stated herein.

*Nigle B. Barrow, Jr., Esq. for Plaintiff.*

*Patterson Dilthey, LLP by Ronald C. Dilthey, Esq. for Defendants.*

Jolly, Judge.

PROCEDURAL HISTORY

[1]     On January 19, 2006, Plaintiff filed his Complaint in Wake County.  In the Complaint, Plaintiff alleges the following causes of action ("Claim(s)"): (a) First Claim – Breach of Contract; (b) Second Claim – Declaratory Judgment; (c) Third Claim – Violation of Chapter 57C of the North Carolina General Statutes; (d) Fourth Claim – Breach of Fiduciary; (e) Fifth Claim –  Constructive Fraud; (f) Sixth Claim – Fraud; (g) Seventh Claim – Conversion; (h) Eighth Claim – Derivative Action – Lewis Financial Management, LLC; (i) Ninth Claim – Derivative Action – LFM Operating Company, LLC; (j) Tenth Claim – Injunctive Relief; (k) Eleventh Claim – Negligence; (l) Twelfth Claim – Dissolution and Sale of Enterprise; (m) Thirteenth Claim – Meiselman Claim; (n) Fourteenth Claim – Removal of Manager; (o) Fifteenth Claim – Accounting and (p) Sixteenth Claim – Constructive Trust.

[2]     On April 4, 2008, Defendants filed their Motion to Dismiss, Answer and Counterclaim.  On April 10, 2008, Defendants filed their First Amended Motion to Dismiss, Answer and Counterclaim ("Answer").[1]  In their Answer, Defendants allege the following counterclaim causes of action ("Counterclaim(s)"): (a) First Counterclaim – Negligence; (b) Second Counterclaim – Breach of Contract; (c) Third Counterclaim – Breach of Implied Contract; (d) Fourth Counterclaim – Violation of Trade Secrets Protection Act; (e) Fifth Counterclaim – Declaratory Judgment; (f) Sixth Counterclaim – Violation of N.C. Gen. Stat. § 57C; (g) Seventh Counterclaim – Constructive Fraud; (h) Eighth Counterclaim – Fraud and (i) Ninth Counterclaim – Conversion.

---

[1] Because Defendants did not brief their Motion to Dismiss as required by Rule 15.2 of the General Rules of Practice and Procedure for the North Carolina Business Court ("BCR"), the court deems this motion to be abandoned and does not consider it herein.

[3]     On May 6, 2009, Plaintiff filed his Reply to Counterclaim, in which he moved to dismiss Defendants' Counterclaims pursuant to Rule 12(b) and responded to the substantive allegations of the Counterclaims.[2]

[4]     On June 11, 2009, Defendants filed their Motion for Summary Judgment ("Defendants' Motion").[3]

[5]     On June 15, 2009, Plaintiff filed his Motion for Summary Judgment ("Plaintiff's Motion").[4]

[6]     On October 19, 2009, Plaintiff filed a motion to strike affidavits of Defendant Douglas J. Lewis and Kenneth Martin, both filed on October 9, 2009.  The court denied this motion at a hearing on January 6, 2010.

[7]     The Motions have been briefed, argued and are ripe for adjudication.[5]

## FACTUAL BACKGROUND

[8]     Unless otherwise indicated herein, the material facts reflected in paragraphs 9 through 47 of this Opinion and Order exist, are undisputed[6] and are pertinent to the issues raised by the Motions.

---

[2] Because Plaintiff did not brief his Motion to Dismiss as required by BCR 15.2, the court deems such Motion to Dismiss to have been abandoned and does not consider it herein.

[3] Defendants move for summary judgment dismissal of each of Plaintiff's Claims.  They do not seek summary judgment in their favor as to any of their Counterclaims.

[4] Plaintiff moves for summary judgment dismissal of each of Defendants' Counterclaims.  Plaintiff also moves for summary judgment in his favor with regard to one or more of his Claims, but it is unclear from Plaintiff's briefs whether he intends his Motion to seek judgment in his favor as to all or only some of his Claims.  For purposes of this Opinion and Order, the court will deem Plaintiff's Motion to seek such relief as to all of Plaintiff's Claims.

[5] The court recognizes that certain of Plaintiff's Clams and Defendants' Counterclaims are derivative in nature.  However, except with regard to Plaintiff's Eight and Ninth Claims, neither party has raised an issue regarding standing of the Plaintiff or Defendants to allege a derivative Claim or Counterclaim.  The court does not undertake an analysis of standing or derivative issues in this Opinion and Order, but will consider them if raised at trial.

[6] It is not proper for a trial court to make findings of fact in determining a motion for summary judgment under Rule 56.  However, it is appropriate for a Rule 56 order to reflect material facts that the court concludes exist and are not disputed, and which support the legal conclusions with regard to summary judgment.  *Hyde Ins. Agency v. Dixie Leasing Corp.*, 26 N.C. App. 138 (1975).

[9]     Troy M. Smith ("Smith") is a citizen and resident of Wake County, North Carolina.

[10]     Douglas J. Lewis ("Douglas Lewis") is a citizen and resident of Wake County, North Carolina.

[11]     Linda P. Lewis ("Linda Lewis") is a citizen and resident of Wake County, North Carolina.

[12]     LFM Operating Company, LLC (the "Operating Company") was a North Carolina limited liability company, which was dissolved on January 1, 2005.

[13]     Lewis Financial Management, LLC (the "Financial Company") is a North Carolina limited liability company (collectively, the Operating Company and the Financial Company are referred to as the "Defendant Companies").

[14]     For many years prior to 1999, Douglas Lewis did business as Lewis Financial Management ("Lewis Financial Management").[7]  Douglas and Linda Lewis produced a radio program on WPTF called "Money Matters with Doug and Linda," which they used for advertising and marketing.  Douglas Lewis also was engaged in the financial services industry including, but not limited to, providing investment advice as a Registered Investment Advisor and selling securities and insurance.  Linda Lewis worked with Douglas Lewis in the business and was an active part of the business.

[15]     Smith was employed in the securities industry when he first met Douglas Lewis, who was also in the securities business.  Smith's business was primarily located in Moore County, North Carolina, and was known as Tax Deferred Retirement Planners, Inc. ("TDRP"), a North Carolina corporation.

---

[7] At various times, the parties loosely refer to the Defendant Companies as Lewis Financial Management.

[16]    In October 1998, Douglas Lewis sought to employ and affiliate Smith with Lewis Financial Management.  Douglas Lewis promised Smith income in excess of $200,000 per year.[8]  He also promised and fulfilled his promise to train and mentor Smith.

[17]    Subsequently, Smith voluntarily agreed to relocate his family from Moore County to Raleigh, North Carolina.

[18]    On January 30, 1999, Douglas Lewis and Smith entered into a "MEMORANDUM OF AGREEMENT" (the "Agreement").[9]  The unsigned Agreement states, "[t]he period of this agreement will be for one year, to be reviewed at the end thereof to see if it has proven successful and can be formatted into a permanent, long-term arrangement."  The Agreement also discusses the treatment of clients should "the arrangement between Troy and LFM . . . not continue in the future."

[19]    Sometime after Smith began working for Lewis Financial Management, he asked his brother, Brady Smith, to sell financial products for TDRP and to assist him in updating the computer systems at Lewis Financial Management.[10]

[20]    On February 5, 2001, the Defendant Companies were formed.  The law firm of Wyrick, Robbins, Yates & Ponton, LLP ("Wyrick Robbins") prepared numerous documents relating to the Defendant Companies and revised such documents many times.  The parties at various times signed signature pages for operating agreements and other documents.  These documents continue to be held in escrow by Wyrick Robbins.

---

[8] Answer 26, ¶¶ 6, 7; Reply Countercl. ¶ 7.
[9] *See* Defs. Mem. Supp. Mot. Summ. J. Att. 1.
[10] T. Smith Aff. ¶¶ 15-16.

[21]    Smith contends that around the same time, Douglas Lewis sent a letter to Lewis' clients regarding the succession plan.[11]  In the letter, Douglas Lewis ostensibly stated that "[t]he members of [the Financial Company] are Doug, Troy, and Linda (Douglas J. Lewis, Troy M. Smith, and Linda P. Lewis)."[12]  The letter informed clients that their "present advisory contracts with Lewis Financial Management will be assigned over to [the Financial Company]."[13]

[22]    All revenue from the Financial Company, Douglas and Linda Lewis and Smith was paid into the Operating Company pursuant to agreement among the parties.[14]

[23]    Douglas and Linda Lewis had no entitlement to any portion of the revenues or profits of TDRP.[15]  It is undisputed that neither Douglas nor Linda Lewis were to have any equity interest in TDRP.[16]  However, Smith testified that TDRP has contributed capital to and became owner of a class of shares of the Operating Company.[17]

[24]    At times material, the Operating Company "paid salaries, and provided other benefits typically provided by employers, to employees providing services to [the Financial Company] and TDRP."[18]

[25]    During Smith's association with the Defendant Companies, Douglas and Linda Lewis traveled frequently to Israel and resided there for extended periods of

---

[11] T. Smith Aff. ¶ 24, Ex. A.
[12] *Id.* Ex. A.
[13] *Id.*
[14] Compl. 2, ¶ 16; Answer 28, ¶ 16; Reply Countercl. ¶ 16; *see also* T. Smith Aff. ¶¶ 25-26.
[15] Compl. 2, ¶ 16; Answer 28, ¶ 16; Reply Countercl. ¶ 16; *see also* T. Smith Aff. ¶¶ 25-26.
[16] Answer 29, ¶ 19; Reply Countercl. ¶ 19.
[17] T. Smith Dep. 34:10-19; 41:11-19; 42:10-14;
[18] *See* Compl. 2, ¶ 18; Answer 5, ¶ 18.

time.[19] As a result, Smith provided managerial services to the Defendant Companies while the couple was in Israel.[20] It is undisputed that Smith was a member of the Defendant Companies and, at different periods of time, served as the managing member when Douglas Lewis was out of the country.[21]

[26] In November 2001, Douglas and Linda Lewis and Smith agreed to divide profits of the Financial Company into thirds, one-third (1/3) for each individual.[22] This agreement was made retroactive to January 1, 2001,[23] and remained in place until at least September 30, 2003, the date of Smith's resignation.[24]

[27] At times material, any and all profits from TDRP were distributed to Smith.[25]

[28] On January 3, 2003, Smith sent a letter to Douglas Lewis regarding his future with the Defendant Companies (the "January 3, 2003 Letter").[26] In this letter, Smith states that he, Douglas and Linda Lewis:

> [C]urrently have an income sharing arrangement . . . . Regardless of what your future activity might be, we still need to workout a permanent arrangement . . . . When you both left two years ago, you said my performance while you were gone was a test to see if I could manage the business and close new planning clients . . . . As far as I'm concerned the test is over and the results are that I have taken the risk out of you selling your business to me. We must now harness the effort and time to do it. Currently, Wyrick

---

[19] Answer 5, ¶ 19.
[20] Defs. Mem. Supp. Mot. Summ. J. 17 ("[I]t is undisputed that Troy Smith served as the manager of the LLCs for most of the time that Doug Lewis was in Israel."). *Cf.* Answer 4, ¶ 19 (wherein Defendants allege that Smith was not a manager of either company as defined by N.C. Gen. Stat. § 57C-1-03(13) (hereinafter, all references to the General Statues will be to "G.S.")).
[21] D. Lewis Aff. ¶ 8; *see also* Answer 40, ¶ 66; Reply Countercl. ¶ 66.
[22] T. Smith Aff. ¶ 30.
[23] *Id.*
[24] *Id.* ¶ 31; *see also* Answer 5, ¶¶ 21-22.
[25] *Id.* ¶ 28 (Smith indicates herein that TDRP was no longer his corporation). Douglas Lewis argues that none of Defendants ever had any form of ownership, equity or income interest in TDRP. D. Lewis Aff. ¶ 11.
[26] Defs. Br. Opp'n Pl. Mot. Summ. J. Ex. 2.

> Robbins is holding all are documents in 'escrow' until they are paid. The question is what do the documents accomplish? Yes, they do give formal authority to me to manage your business. But they do not give me any real ownership alo ng (sic) with control. Most discouraging is that our current arrangement does not provide me any increasing equity.[27]

[29] On March 24, 2003, Douglas Lewis responded to Smith by e-mail, with an attached letter dated January 8, 2003.[28] In response to a question Smith had posed in his January 3, 2003 letter, asking for whom a new employee would be working, Douglas Lewis wrote, "[s]he will be working for [the Financial Company] and as there are 3 owners, she will be working for the 3, just as if all three were in the office."[29] In his e-mail/letter, Douglas Lewis also refers to an existing "buy-sell agreement."[30] He states that Smith "can start to buy the business at whatever point [Smith] want[s]."[31]

[30] Later, in early 2003, Douglas and Linda Lewis returned to the United States from Israel. Following their return, they increased their involvement in the daily operations of the Defendant Companies.

[31] Subsequently, also in early 2003, the parties had discussions concerning the sale of the Defendant Companies to Smith.[32] About this time, Douglas Lewis advised Smith that he no longer desired TDRP to be associated in any way with Lewis Financial Management.[33]

[32] Later in 2003, Smith and Douglas and Linda Lewis received from Wyrick Robbins copies of all documents, including signature pages, for which fees had been

---

[27] *Id.*
[28] Pl. Resp. Defs. Mem. Supp. Defs. Mot. Summ. J. Ex. B.
[29] *Id; but see* Prince Aff. 58:2-20 (stating that Smith was an employee of "Doug's business").
[30] Pl. Resp. Defs. Mem. Supp. Defs. Mot. Summ. J. Ex. B.
[31] *Id.*
[32] Answer 31, ¶ 26; Reply Countercl. ¶ 26.
[33] Compl. 4, ¶ 29; Answer 7, ¶ 29.

incurred.[34] At this time, material provisions of the business arrangements of the parties remained incomplete, and the documents were not assembled (i.e., the signature pages were not affixed to the documents.) One or more of the documents were dated October 5, 2001.

[33] On August 21, 2003, Douglas and Linda Lewis provided a letter to Smith in which the couple stated, "we do not have peace at the present time to sell equity in the business" and "we feel the need to terminate our arrangement."[35] In the letter, they suggested that "[s]ince [they and Smith] spent much time in discussions with Wyrick Robbins considering what we would do if we ever reached this point, it is probably wise if we follow the procedures in the documents they produced for us." Douglas and Linda Lewis then pointed to the Operating Company's documents, contending that such documents:

> [S]peak to the removal of a manager "with cause": cause being a "material breach . . . which has the effect of harming the revenues of the business . . . [and] the other members." However, they also speak to a resignation of a manager (para #3.4), and to the removal of a manager "without cause." Further in the documents there are paragraphs that deal with redemption and valuation of units . . . . According to the pertinent paragraphs, once you are no longer the manager, you then offer the remaining members, the opportunity to exercise their purchase options. Under these options they (we) buy out your interests in both of the LLCs.
>
> The price of the units of each LLC is the higher of your capital account or $100. At present, both of your capital accounts are either negative or negligible. Although the capital account contributions to [the Operating Company] were not valued when we formed the LLC, they are identified as (i) all the assets of TDRP and (ii) your contractual

---

[34] Depositions indicate that Denise Buchanan picked up the documents from the law firm. *See, e.g.*, T. Smith Dep. 169:3-20; Cook and Cobb Deps. 25:22-26:10, 27:3-9; L. Lewis Dep. 65:8-66:3; D. Lewis Dep. 107:3-13.

[35] Defs. Mem. Supp. Mot. Summ. J. Att. 8.

obligation to sign over all HBI and insurance commissions. What we feel would be proper would be returning to you these two items as "payment" for your units in the LLC.[36]

[34]    The letter then refers to Douglas and Linda Lewis as "the remaining members of the LLC" and refers to a section in the operating agreement for the Financial Company that permits Smith "to take back TDRP clients if [he] leave[s] the company."

[35]    On September 30, 2003, Smith resigned as manager of the Defendant Companies.  Smith had no active involvement in the Defendant Companies on or after September 30, 2003.[37]  Since that day, Smith received no profits or distributions from the activities of the Defendant Companies.  However, Smith has testified by affidavit that after his resignation as manager he continued to work to assist in the final stages of transition to a new software system.[38]

[36]    On February 6, 2004, Douglas Lewis sent a letter to Smith advising Smith of his removal for cause from the Defendant Companies.[39]

[37]    On March 5, 2004, Smith sent at least one letter to potential clients advising them that he had "terminated [his] affiliation and resigned as Managing Partner of Lewis Financial Management LLC."[40]

---

[36] *Id.*; D. Lewis Aff. ¶ 11 (stating that "at no point in time, did any of the Defendants have any form of ownership, equity, or income interest in TDRP").
[37] Answer 30-31, ¶¶ 28, 30; Reply Countercl. ¶ 28, 30.
[38] T. Smith Aff. ¶ 40.
[39] Answer 31, ¶¶ 28-29.  D. Lewis Dep., marked Pl. Ex. 28.
[40] Defs. Br. Opp'n Pl. Mot. Summ. J. Ex. 1.  *See also* Def. Mem. Supp. Mot. Summ. J. Att. 5 (including two such letters).  Smith states that Douglas Lewis sent a letter to these clients in response.  T. Smith Aff. ¶ 47.  The court has not been able to locate this letter, introduced as Exhibit B in Smith's Affidavit.  As such, the court declines to consider Smith's description of this letter.

[38]    Thereafter, Douglas and Linda Lewis exercised dominion and control over the Defendant Companies.[41]  Douglas Lewis functioned as the manager of the Defendant Companies and exercised complete dominion and control over them.[42]

[39]    After Smith's resignation and prior to dissolution of the Operating Company, Douglas and Linda Lewis contributed all income generated by Lewis Financial Management to the Operating Company and caused profits from Lewis Financial Management to be used for operating expenses or distributed to Douglas and Linda Lewis.[43]  They prevented the Defendant Companies from paying any distributions to Smith at anytime after September 30, 2003.

[40]    As of December 31, 2003 and December 31, 2004, the Operating Company's balance sheets show equity capital in Smith's name totaling $49,285.56, roughly seventy-eight percent (78%) of the Operating Company's capital account.[44]

[41]    Effective January 1, 2005, Douglas and Linda Lewis dissolved the Operating Company.[45]

[42]    Kenneth Martin ("Martin") is a CPA whose firm, Stancil and Company, prepared the income tax returns for Lewis Financial Management and then later the Defendant Companies.[46]  In his deposition, Martin testified that his accounting firm initially understood that Douglas and Linda Lewis provided an initial cash contribution to the Operating Company.[47]  However, he later testified that his firm was told that the

---

[41] Compl. 16, ¶ 1, 18, ¶ 1; Answer 17, ¶ 1.
[42] Compl. 18, ¶ 4; Answer 18, ¶ 4.
[43] *See*, *e.g.*, Answer 20, ¶ 3.
[44] Pl. Resp. Defs. Mem. Supp. Defs. Mot. Summ. J. Ex. D.
[45] Pl. Mem. Supp. Mot. Summ. J. Ex. A.
[46] Martin Aff. ¶ 2.
[47] Martin Dep. 46:7-16.

cash contribution had come from Smith.[48]  As a result, the accounting firm increased Smith's capital account by $10,785.[49]  However, Martin also later testified by affidavit that at no time was his firm "ever provided with any checks, bank statements or any other documentation that actually showed that Smith made [a] cash contribution."[50]  Such a statement by Martin was tempered by his firm's policy, with limited exception, to not "review documentation of amounts in accounting records which we use to prepare tax returns."[51]

[43]    Martin also testified that, to his best knowledge, "there never was an agreement as to what assets, if any, were to be contributed by any of the Parties to the LLC and the Parties [sic] contribution of intangible assets was never recorded in the capital accounts."[52]

[44]    Further, Smith does not acknowledge any ownership interest in the Defendant Companies on his 9/12/2002, 6/18/2003, 10/27/2003 and 4/5/2005 Form U-4's (Uniform Application for Securities Industry Registration or Transfer).[53]  Gary Hurvitz ("Hurvitz"), Senior Vice President of H. Beck, Inc., a securities broker/dealer registered with the Securities and Exchange Commission, explained that Form U-4 is a "standard

---

[48] *Id.* 46:17-18.
[49] *Id.* 46: 18-20.  In a later affidavit, Martin added the words, "I think," to this statement.  Martin Aff. ¶ 6. By affidavit, Douglas Lewis explained that the $10,785 amount was the same as the Quickbooks balance in a "dba account" on August 31, 2001.  D. Lewis Aff. ¶ 15.  He identified this "dba account" as his personal business account, from which he initially funded the Operating Company's bank account.  *Id.* ¶¶ 4, 9.  Plaintiff protests that Defendants have "refused to produce [the Quickbooks records] in discovery" and that these records have not been authenticated pursuant to Rules 901 and 902 of the Rules of Evidence.  Pl. Mem. Supp. Obj. and Mot. Strike 3.  Plaintiff posits that this amount constituted undistributed profits and either belonged solely to him or jointly to him and Douglas and Linda Lewis.  *Id.* 2-3.
[50] Martin Aff. ¶ 6.
[51] *Id.* ¶ 5.
[52] *Id.* ¶ 8.
[53] H. Beck, Inc. Documents to Subpoena, filed under seal.

form used by the broker/dealer industry . . . to record information about individual registered representatives."[54]

## SUMMARY JUDGMENT

[45]    Under Rule 56(c), summary judgment is to be rendered "forthwith" if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.  When the forecast of evidence demonstrates that the plaintiff cannot satisfy an essential element of a claim or overcome an affirmative defense established by the defendant, summary judgment for the defendant should be granted.  *Grayson v. High Point Dev. Ltd. P'ship*, 175 N.C. App. 786, 788 (2006).  The court views the evidence in the light most favorable to the nonmoving party.  *Bruce-Terminix Co. v. Zurich Ins. Co.*, 130 N.C. App. 729, 733 (1998).

## THE PARTIES' CONTENTIONS

[46]    Plaintiff contends, among other things, that (a) Douglas and Linda Lewis converted Plaintiff's membership interest in the Defendant Companies; (b) Douglas and Linda Lewis wrongfully repudiated an implied contract between the parties to share profits one-third (1/3) each; (c) Douglas and Linda Lewis are liable for breach of fiduciary duty; (d) Plaintiff is entitled to the enforcement of his rights under G.S. 57C; (e) Douglas and Linda Lewis should be ordered to render a full accounting for all activities

---

[54] Hurvitz Dep. 3:22-23; 4:9-10; 7:24-8:1.  In his deposition, Hurvitz testified that the Form U-4 appears to require disclosure of equity ownership in companies by whom the applicant is not employed.  *Id.* 13:25-14:3.

of the Defendant Companies after September 30, 2003 and (f) Douglas and Linda Lewis are liable for unfair and deceptive trade practices under Chapter 75.[55]

[47]     Defendants contend, among other things, that (a) many of Plaintiff's claims are based on the false assumption that he is the owner of and had an interest in the Defendant Companies;[56] (b) the parties' business arrangement was terminated on August 21, 2003; (c) Plaintiff has failed to produce sufficient evidence as to any misrepresentations made by Defendants that were reasonably calculated to deceive and made with an intent to deceive; (d) Plaintiff did not have any rights or ownership in the distributions from the Defendant Companies; (e) declaratory judgment relief is inappropriate; (f) Plaintiff does not have standing to bring a derivative action against Douglas and Linda Lewis; (g) there was no fiduciary relationship between Plaintiff and Douglas and Linda Lewis; (h) Plaintiff has no claim for relief under the doctrine of constructive fraud; (i) Plaintiff has failed to allege and offer any evidence that Douglas and Linda Lewis breached a legally recognized duty to Plaintiff; (j) there is no separate claim for relief under *Meiselman* and (k) all claims for relief against the Defendant Companies should be dismissed because Plaintiff's attacks are directed solely at the conduct of Douglas Lewis.

---

[55] The court does not consider a Chapter 75 claim herein because Plaintiff did not allege such a claim in his Complaint.

[56] Def. Mem. Supp. Mot. Summ. J. 5 (referring to Plaintiff's Third, Fourth, Fifth, Seventh, Eighth, Ninth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth and Sixteenth Claims).

## DISCUSSION

### Plaintiff's Claims

### Plaintiff's Third, Fourth, Fifth, Seventh, Eighth, Ninth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth and Sixteenth Claims

[48]   Each of these Claims by Plaintiff fundamentally rests upon Plaintiff's contention that he was a member with an ownership interest in the Defendant Companies by virtue of his capital contributions, and that his ownership interest continued after September 30, 2003.  Accordingly, the court elects to group them for purposes of this Opinion and Order.  Plaintiff's First, Second, Sixth and Tenth Causes of Action will be dealt with individually.

[49]   Based upon the forecast of evidence before it, the court CONCLUDES that as to each such Claim, there exist one or more genuine issues of material fact with regard to this threshold contention.  Neither Plaintiff nor Defendants are entitled to summary judgment as to said Claims, and as to each of them the respective Motions should be DENIED.[57]

### Plaintiff's First Claim –  Breach of Contract

[50]   In his Complaint, Plaintiff alleges that (a) the parties established a contract by course of dealing, whereby the net profits of the Defendant Companies would be divided equally among Smith and Douglas and Linda Lewis; (b) by their dominion and control over the Defendant Companies, Douglas and Linda Lewis caused these companies to breach their contract for division of the profits and (c) Douglas and Linda Lewis themselves breached their agreement with Smith by failing to distribute to him

---

[57] Further analysis as to these Claims is not necessary for the purposes of this Opinion and Order.

one-third (1/3) of the operating profits from the Defendant Companies and by failing to distribute any profits to him from activities arising on or after September 30, 2003.

[51]    In his Motion, Plaintiff argues that the following facts are not disputed: (a) the three (3) members divided profits equally in 2001, 2002 and 2003 (through September 30, 2003); (b) after the takeover by Douglas Lewis, Smith received nothing and (c) there is no evidence that Smith ever agreed to surrender his interest for nothing.

[52]    The Defendants respond that Plaintiff is estopped from claiming to be a member of the Defendant Companies[58] and assert that the Agreement was a "variable income sharing arrangement."[59]

[53]    Plaintiff replies that he is not estopped from claiming membership.[60]

[54]    In their Motion, Defendants argue Plaintiff has failed to forecast sufficient evidence that an established and enforceable contract existed between Plaintiff and Defendants at any time after September 30, 2003.

[55]    Defendants contend that under the Agreement, the parties agreed that their relationship would be one of revenue sharing.[61]  The Agreement stated that "the period of the Agreement would be for one year, to be reviewed at the end thereof to see if it has proven successful and can be formatted into a permanent, long-term arrangement."[62]  Defendants say that the Agreement continued in 2000,[63] and that when the Defendant Companies were formed in early 2001, the parties verbally agreed that Douglas Lewis would receive 50% of the Defendant Companies' gross receipts and

---

[58] Defs. Br. Opp'n Pl. Mot. Summ. J. 1.
[59] *Id.* 4.
[60] Pl. Reply Defs. Br. Opp'n Pl. Mot. Summ. J. 1-2.
[61] Defs. Mem. Supp. Mot. Summ. J. 2.  This Agreement is unsigned.  L. Lewis Dep. 33-35.
[62] Defs. Mem. Supp. Mot. Summ. J. Att. 1.
[63] *Id.*

Smith would receive the remaining profits after expenses.[64] Defendants assert that Douglas Lewis thereafter determined that the parties would go to a one-third (1/3) profit sharing model in 2002.[65]

[56]     Defendants further argue that no enforceable contract existed at any point after August 21, 2003, and that any informal agreement that had been in place was terminated that day by written notice to Plaintiff.[66]

[57]     Defendants also say that they compensated Plaintiff via a check on September 30, 2003, on which they noted it to be Plaintiff's final distribution.[67] Moreover, they point out that Plaintiff indicated to current and former clients of Defendants that he had "terminated [his] affiliation and resigned as Managing Partner of [the Financial Company] as of September 30, 2003."[68]

[58]     Based on the forecast of evidence before it, the court CONCLUDES that as to this Claim, there exist one or more genuine issues of material fact as to the parties' intentions regarding the ownership and operation of the Defendant Companies, as well as the terms and existence of any implied contract arising from the parties' course of dealing.  Neither Plaintiff nor Defendants are entitled to summary judgment as to said Claim, and as to it the Motions should be DENIED.[69]

---

[64] *Id.* 3.
[65] *Id.*
[66] *Id.* Att. 8.
[67] *Id.* Att. 9.
[68] *Id.* Att. 5.
[69] Further analysis as to this Claim is not necessary for the purposes of this Opinion and Order.

<u>Plaintiff's Second Claim – Declaratory Judgment</u>

[59]    Plaintiff's Second Claim seeks a declaratory judgment regarding whether the draft operating agreements of the Defendant Companies are controlling.

[60]    With regard to his Second Claim, Plaintiff argues that Defendants are estopped from denying that the draft operating agreements were not mutually assented to and are not controlling, and that he therefore is entitled to summary judgment on his Claim for declaratory judgment.  In response, Defendants argue that declaratory judgment relief for Plaintiff, pursuant to G.S. 1-253 *et seq.*, is inappropriate because Plaintiff is asking the court to construe an operating agreement(s) that never existed.[70] As such, Defendants contend there is no document subject to declaratory relief for the court to review and interpret.

[61]    Plaintiff also seeks summary judgment in his favor on Defendants' Fifth Counterclaim, which seeks declaratory relief in favor of Defendants.  In this regard, Defendants offer the affidavit of Martin, who concludes that if the parties were bound by the Operating Company's draft operating agreement, then Plaintiff is indebted to Douglas and Linda Lewis in an amount more than $200,000, which Plaintiff allegedly paid himself from the Operating Company during the time that Douglas Lewis was in Israel and Plaintiff was managing the business.[71]  In his Affidavit, Martin states that at no time was Stancil and Company, "given any understanding that there were in place signed operating agreements regarding [the Defendant Companies].  It has been our understanding that although operating agreements were in the draft states, the parties

---

[70] Defs. Mem. Supp. Mot. Summ. J. 13-14.
[71] Resp. Mem. Defs. 2; *see also* Martin Aff. ¶ 9.

never signed and executed the operating agreements."[72] Plaintiff argues that Defendants cannot rely on the draft operating agreements to recover because they previously alleged that such documents were not completed and are not controlling.[73]

[62]   With regard to this Second Claim by Plaintiff, the court CONCLUDES that there exist genuine issues of material fact regarding whether the operating agreements of the Defendant Companies were completed by the parties and are controlling.

[63]   Accordingly, neither Plaintiff nor Defendants are entitled to summary judgment as to said Claim, and as to it the Motions should be DENIED.[74]

Plaintiff's Sixth Claim – Fraud

[64]   It is well settled in North Carolina that to support a claim for fraud, a plaintiff must prove that there existed (a) false representation or concealment of a material fact; (b) that was reasonably calculated to deceive; (c) that was made with an intent to deceive; (d) did in fact deceive, i.e., was relied upon and (e) resulted in damage to the injured party.  *State Props., LLC v. Ray*, 155 N.C. App. 65 (2002); *Helms v. Holland*, 124 N.C. App. 629, 634 (1996).  Further, if there was in fact reliance upon the representation or concealment, an actionable claim for fraud requires the reliance to have been reasonable.  *Johnson v. Owens*, 263 N.C. 754 (1965).

[65]   In his fraud Claim, Plaintiff alleges that Douglas and Linda Lewis represented to him that he would be associated with the Defendant Companies on a permanent basis and that he "would remain in the enterprise and continue to receive income therefrom."[75]  In response, Douglas and Linda Lewis contend that they did not

---

[72] Martin Aff. ¶ 4.
[73] Pl. Reply Defs. Resp. Pl. Mot. Summ. J. Defs. Countercl. 4.
[74] Further analysis as to this Claim is not necessary for the purposes of this Opinion and Order.
[75] Compl. 13,  ¶¶ 4, 8.

misrepresent to Plaintiff that their association with him "would definitely be permanent" and that Plaintiff has not forecast admissible evidence that they made any such misrepresentation with fraudulent intent.[76]

[66]     Taken as a whole, the forecast evidence relative to this Claim is unclear and disputed as to what misrepresentations Defendants allegedly made to Plaintiff.[77]

[67]     The Claim itself focuses on representations made during the period when Smith and Douglas and Linda Lewis were in a working relationship.  On October 19, 2000, Douglas Lewis allegedly sent Smith an e-mail entitled "Broad Concepts of Structure."[78]  In that e-mail, Douglas Lewis discussed strategies by which Smith could acquire the Financial Company,[79] stating, "[w]e need to figure out what you have to use to purchase the stock and use that figure, so you don't alter your lifestyle."[80]  In reference to one of the strategies, Douglas Lewis stated, "[y]ou and I could both be RIA reps of this corporate RIA, so that when I retire permanently and it is all yours, the existing RIA would simply continue."[81]  The e-mail later provided, "in concept it would set up a structure that would allow you to be purchasing LFM on a pay-as-you-go basis with the least tax hit to you . . . .  In addition, it would allow you to be an immediate owner of the combined entity."[82]

[68]     In his deposition, Douglas Lewis testified that the purchase price he gave to Smith was not reasonable and was one he knew Smith could not afford.[83]  Douglas

---

[76] Def. Br. Supp. Mot. Summ. J. 12.
[77] Though Plaintiff has moved for summary judgment as to the fraud Claim, he only discusses the Claim in response to Defendants' brief supporting their own Motion as to this Claim.
[78] Pl. Br. Opp'n Defs. Mot. Summ. J. 8; Defs. Mem. Supp. Mot. Summ. J. Att. 3.
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] D. Lewis Dep. 122:5-12, 20; 122:24-123:1.

Lewis represented that he set the purchase price at a high level because it would take ten (10) years for the company to produce that much money. In fact, Douglas Lewis intended to "watch [Smith] test and prove himself over ten years," then "watch to see what would happen." Douglas Lewis admitted that he knew Smith "could never get 10 million – he'd never get $6 million. [Douglas Lewis] knew it wasn't worth anywhere near $6 million."[84] Douglas Lewis contends that such representations regarding Smith's potential purchase or ownership of the Defendant Companies were not made with fraudulent intent or with the intent to induce reliance.

[69] Douglas and Linda Lewis point out that in the January 3, 2003 Letter, Smith wrote:

> When you both left two years ago, you said my performance while you were gone was a test to see if I could manage the business and close new planning clients . . . . In many ways, the "testing" ground could not have been more inhospitable . . . . As far as I'm concerned the test is now over and the results are that I have taken the risk out of you selling your business to me . . . . Please let me know where we are headed soon."[85]

[70] During their working relationship, Smith and Douglas and Linda Lewis formed the Defendant Companies. The Defendant Companies retained Wyrick Robbins to prepare organizing documentation, including operating agreements. Smith argues that because the Defendant Companies have a perpetual existence and, as such, can only be dissolved by agreement or by court order, there was a representation as to a permanent relationship that would leave the Defendant Companies in his ownership.[86]

---

[84] *Id.* 122: 13-21.
[85] Defs. Mem. Supp. Mot. Summ. J. Att. 7; Defs. Br. Opp'n Pl. Mot. Summ. J. Ex. 2.
[86] Pl. Br. Opp'n Defs. Mot. Summ. J. 8.

[71]    As indicated in the court's discussion of the Plaintiff's Second Claim, *supra*, a genuine issue of material fact exists as to whether Smith and Douglas and Linda Lewis ever came to an agreement as to the substance of the operating agreements.  Additionally, there exists a genuine issue of material fact as to whether Douglas Lewis made representations regarding Smith's potential purchase or ownership of the Defendant Companies with fraudulent intent.

[72]    With regard to this Sixth Claim by Plaintiff, the court CONCLUDES that there exist genuine issues of material fact and that neither Plaintiff nor Defendants are entitled to summary judgment as to said Claim, and as to it the Motions should be DENIED.[87]

<u>Plaintiff's Tenth Claim – Injunctive Relief</u>

[73]    Plaintiff argues he is entitled to a preliminary injunction (a) requiring Douglas and Linda Lewis and the Financial Company to promptly provide information required by G.S. 57C and (b) prohibiting Douglas and Linda Lewis from paying themselves any distributions or disposing of any assets of the Financial Company in any transaction other than an arms length transaction at fair market value.

[74]    A preliminary injunction is "an extraordinary remedy and will not be lightly granted." *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 692 (1976).  To establish a right to a preliminary injunction a party must show (a) the likelihood of success on the merits and (b) that the moving party is likely to sustain irreparable harm unless the injunction is issued or that an injunction is necessary to protect [one's] rights during the course of the litigation.  *Smith v. N.C. Motor Speedway, Inc.*, 1997 NCBC 5, ¶ 26 (N.C.

---

[87] Further analysis as to this Claim is not necessary for the purposes of this Opinion and Order.

Super. Ct. Nov. 12, 1997); *see also A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401 (1983).

[75]     Plaintiff also seeks a permanent injunction requiring the Financial Company to distribute to Plaintiff one-third (1/3) of the profits of the Financial Company and the associated business, presumably the   Operating Company, no less than upon a monthly basis.[88]

[76]     With regard to this Tenth Claim by Plaintiff, the court CONCLUDES that there exist genuine issues of material fact and that neither Plaintiff nor Defendants are entitled to summary judgment as to said Claim, and as to it the Motions should be DENIED.[89]

Defendant's Counterclaims

Defendants' First Counterclaim – Negligence

[77]     In their Counterclaim for Negligence, Defendants allege that at all times relevant, Plaintiff owed a duty of care "while he was employed by them and involved in the day-to-day operations of the business."[90]  Defendants also allege that Douglas and Linda Lewis relied upon Plaintiff to exercise ordinary care and use his best efforts to further the business of the Defendant Companies.[91]

[78]     Defendants allege that Plaintiff breached the duty of care he owed them and the Defendant Companies by, among other things, (a) failing to take advantage of leads that had been arranged for him by Douglas and Linda Lewis and from their radio program; (b) failing to focus on clients with larger repositionable assets; (c) failing to be

---

[88] Compl. 19-20.
[89] Further analysis as to this Claim is not necessary for the purposes of this Opinion and Order.
[90] Answer 33, ¶ 33.
[91] *Id.* ¶ 38.

available to take calls from listeners to the radio program due to the fact that he did not arrive at work by 8:00 a.m., as he agreed to do; (d) failing to work the hours necessary to manage the business and maintain its profitability; (e) hiring one or more of his relatives without permission and paying them salaries not commensurate with their contribution to the Defendant Companies, and causing the Defendant Companies unnecessarily to pay retirement contributions for one or more of his relatives; (f) inappropriately handling company finances including, but not limited to, causing monies to be transferred from firm accounts into his own personal accounts without any authorization to do so; (g) failing to maintain company procedures, including putting the company at risk for both NASD and SEC violations; (h) sharing confidential company financial information with one or more of his family members; (i) failing to complete clients' financial plan documents or otherwise preparing substandard financial plan documents for company clients and (j) attempting to change clients from the name of Douglas J. Lewis to Smith/Lewis.[92]

[79]    Plaintiff argues that (a) acts by him prior to February 5, 2001 are barred by the statute of limitations under G.S. 1-52; (b) the articles of organization for both the Defendant Companies expressly release him from liability to the companies and their members for negligence and (c) no alleged acts of negligence relate to the period after August 21, 2003, when Douglas and Linda Lewis were in complete control.[93]

---

[92] *Id.* ¶ 39.
[93] Pl. Mem. Supp. Pl. Mot. Summ. J. Defs. Countercl. 1-2.

[80]     With regard to this First Counterclaim, the court CONCLUDES that there exist genuine issues of material fact and that Plaintiff is not entitled to summary judgment as to said Claim, and as to it the Plaintiff's Motion should be DENIED.[94]

<u>Defendants' Second Counterclaim – Breach of Contract</u>

[81]     In their Second Counterclaim, Defendants allege that (a) the Agreement between Smith and Douglas Lewis was a binding and enforceable contract, which remained in effect, subject to agreed upon modifications by the parties, up to and including September 30, 2003; (b) by entering into the Agreement, Smith was contractually obligated to perform in accordance with that Agreement; (c) Smith materially breached the terms set forth in the Agreement by, among other things, (i) failing to perform completely and adequately the responsibilities set forth in the fourth paragraph of the Agreement; (ii) failing to be at the office by 8:00 a.m., as required by the Agreement; (iii) taking more personal time than allowed under the Agreement; (iv) soliciting clients of the Financial Company both before and after his September 30, 2003 termination and/or resignation from the Defendant Companies in violation of the Agreement and (v) extracting for himself, prior to distributions to Douglas and Linda Lewis, monies from the Defendant Companies at times when he was not entitled to receive such monies.

[82]     Plaintiff argues that the Agreement itself is unsigned,[95] and because it is for a term of one (1) year, any claim for a breach thereof during the one-year period is barred by the applicable three-year statute of limitations pursuant to G.S. 1-52. Defendants do not respond to this argument.

---

[94] Further analysis as to this Claim is not necessary for the purposes of this Opinion and Order.
[95] L. Lewis Dep. 33-35.

[83]    The court CONCLUDES that there exist genuine issues of material fact regarding (a) whether, and for how long, the parties were subject to the Agreement after its initial one-year term and (b) whether and how the Agreement changed after its initial one-year term.

[84]    Accordingly, Plaintiff is not entitled to summary judgment as to said Counterclaim, and as to it Plaintiff's Motion should be DENIED.[96]

### Defendants' Third Counterclaim – Breach of Implied Contract

[85]    In their Third Counterclaim, Defendants allege that if the Agreement was not in effect during any time up to and including September 30, 2003, then the parties, by their course of dealing, had an implied contract where each side agreed to be bound to the same or similar terms as those set forth in the Agreement.[97]  Defendants also allege that Plaintiff breached the duties owed pursuant to this implied contract.  Such contended breaches are similar to those alleged in Defendants' Second Counterclaim,[98] in addition to an allegation that Plaintiff failed to "return overpayments to him, including those resulting from the changed income sharing arrangements which he knew or should have known he owed at a later date[.]"[99]

[86]    Plaintiff argues that he "consistently performed his duties from February 5, 2001 until August 21, 2003, when Douglas and Linda Lewis demanded that he stop."[100] Plaintiff also argues that (a) the Defendant Companies' articles of organization release

---

[96] Further analysis as to this Claim is not necessary for the purposes of this Opinion and Order.
[97] Answer 36, ¶ 48.  Plaintiff agrees that a contract was created by course of dealing. *Cf.* Reply Countercl. ¶ 48.
[98] *Cf.* Answer 35, ¶ 44; 36, ¶ 48; 37, ¶ 50.
[99] *Id. 37,* ¶ 50(f).
[100] Pl. Mem. Supp. Pl. Mot. Summ. J. Def. Countercl. 2.

him from liability and (b) liability for acts prior to February 5, 2001, are barred by the three-year statute of limitations under G.S. 1-52.

[87]    The court CONCLUDES that there exist genuine issues of material fact with respect to the parties' intentions regarding ownership and operation of the Defendant Companies, as well as the terms of any implied-in-fact contract created by the parties' course of dealing.

[88]    Accordingly, Plaintiff is not entitled to summary judgment as to Defendants' Third Counterclaim, and as to it Plaintiff's Motion should be DENIED.[101]

Defendants' Fourth Counterclaim – Violation of Trade Secrets Protection Act

[89]    With regard to this Counterclaim, Defendants allege that Plaintiff (a) was provided access to trade secrets, as that term is defined under G.S. 66-152(3), during the course of his affiliation with Defendants; (b) had a duty not to misappropriate any trade secrets of Defendants by virtue of the position of trust and confidence held by Plaintiff with respect to the Defendant Companies; (c) misappropriated trade secrets belonging to Defendants without their express or implied authority or consent after his termination and/or resignation on September 30, 2003 and (d) continues to use the trade secrets and other materials created by Defendants without their express or implied consent.

[90]    To establish a trade secrets claim, the complainant must "identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468

---

[101] Further analysis as to this Claim is not necessary for the purposes of this Opinion and Order.

(2003) (citations omitted); *see also Washburn v. Yadkin Valley Bank & Trust Co.*, 190 N.C. App. 315, 326-27 (2008).

[91]    The Fourth Counterclaim itself refers only generally to confidential company financial information as the so-called trade secret(s) that Plaintiff misappropriated by allegedly sharing with one or more members of his family.[102] However, Douglas Lewis testified by affidavit that Plaintiff removed private and personal records belonging to Douglas and Linda Lewis, as well as, among other things, clients' confidential financial records, social security numbers, income statements and financial statements without the clients' knowledge or consent.[103]

[92]    However, the court concludes that in the absence of a more specific allegation or forecast of evidence as to an alleged trade secret, such a description is not sufficiently particular to meet the requirement that Plaintiff be able to "delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Analog Devices*, 157 N.C. App. at 468.

[93]    Accordingly, the court CONCLUDES that there exist no genuine issues of material fact with regard to this Fourth Counterclaim, and Plaintiff is entitled to summary judgment in his favor as to said Counterclaim.  Plaintiff's Motion with respect to Defendants' Fourth Counterclaim of Violation of Trade Secrets Protection Act should be GRANTED and the Fourth Counterclaim should be DISMISSED.

<u>Defendants' Fifth Counterclaim – Declaratory Judgment</u>

[94]    The discussion above with regard to Plaintiff's Second Claim, in which Plaintiff seeks a declaratory judgment in his favor, applies equally to Defendants' Fifth

---

[102] Answer 33, ¶ 39(h).
[103] D. Lewis Aff. ¶ 14.

Counterclaim. Accordingly, with regard this Fifth Counterclaim, the court CONCLUDES that there exist genuine issues of material fact regarding whether the operating agreements of the Defendant Companies were completed by the parties and are controlling. Plaintiff is not entitled to summary judgment in his favor as to said Counterclaim, and as to it Plaintiff's Motion should be DENIED.[104]

<u>Defendants' Sixth Counterclaim – Violation of N.C. Gen. Stat. § 57C</u>

[95] In their Sixth Counterclaim, Defendants allege that if Plaintiff was a manager of one or more of the Defendant Companies by virtue of a written and/or oral operating agreement, then under G.S. 57C, he was required to discharge his managerial duties in good faith with the care that an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the manager reasonably believes to be in the best interest of the Defendant Companies.[105]

[96] Defendants specifically allege that Plaintiff (a) took revenues and other benefits that belonged to Defendants without obtaining the informed consent of the members of the Defendant Companies and (b) used property of the Defendant Companies for his own personal use, without the informed consent of the members.[106]

[97] G.S. 57C-3-22(e) provides:

> Except as otherwise provided in the articles of organization or a written operating agreement, every manager must account to the limited liability company and hold as trustee for it any profit or benefit derived without the informed consent of the members by the manager from any transaction connected with the formation, conduct, or liquidation of the limited liability company or from any personal use by the manager of its property.

---

[104] Further analysis as to this Claim is not necessary for the purposes of this Opinion and Order.
[105] Answer 40, ¶ 66.
[106] *Id.* ¶ 67.

[98]    Plaintiff argues that Defendants have failed to allege what revenues and other benefits he took,[107] and there has been no forecast of admissible evidence identifying any improper distribution or benefit.[108]

[99]    Plaintiff also argues that (a) Douglas Lewis took over all of the bank accounts upon Douglas Lewis' return to the United States in early 2003[109] and "had ample opportunity to determine any such amounts that were retained and to adjust such amounts in distributions paid to Smith between April and September 2003;"[110] (b) a December 31, 2003 financial statement demonstrates that charges pertaining to Plaintiff's laptop were charged consistently to Plaintiff's account, and "the payout of the lease was likewise charged to [Plaintiff's] account which was a reduction to his capital account"[111]and (c) all banking and bill paying was handled by an employee, except for the period when that employee was banned from the office by the SEC,[112] with whom Douglas Lewis was in contact every day and from whom he received an update "whenever new business was done."[113]

[100]    In response, Defendants argue that if the parties were bound by the draft operating agreement for Operating Company, then Plaintiff is indebted to Douglas and Linda Lewis in an amount more than $200,000, which Plaintiff paid himself from the Operating Company "during the time that Doug Lewis was in Israel and Troy Smith was managing the business."[114]

---

[107] Pl. Mem. Supp. Pl. Mot. Summ. J. Defs. Countercl. 3.
[108] *Id.* 4.  In her affidavit, Prince refers to "automatic recurring payments" made by Lewis but, to the court's knowledge, she does not identify such payments as a misappropriation of funds.  Prince Dep. 62:5-7.
[109] *Id.* 3 (citing D. Lewis Dep. 94-98).
[110] *Id.*
[111] *Id.*
[112] *Id.* 4 (citing D. Lewis Dep. Ex. 23 and Prince Dep. 8-12).
[113] *Id.* (citing Prince Dep. 48-49).
[114] *See*, *e.g.*, Def. Resp. Mem. 2 (discussing Martin's conclusion).

[101]   The court CONCLUDES that there exist genuine issues of material fact regarding whether Plaintiff, as manager of either or both of the Defendant Companies, derived any profit from either without the consent of the members connected with the formation, conduct or liquidation of the Defendant Companies or from any personal use by Plaintiff of the Defendant Companies' property.

[102]   Accordingly, Plaintiff is not entitled to summary judgment as to Defendants' Fifth Counterclaim, and as to it Plaintiff's Motion should be DENIED.[115]

### Defendants' Seventh Counterclaim – Constructive Fraud

[103]   In their Seventh Counterclaim, Defendants allege that Plaintiff, by virtue of his position with the Defendant Companies and his business relationship with Douglas and Linda Lewis, was in a confidential or fiduciary relationship with Defendants.[116] Defendants further allege that Plaintiff sought to benefit himself to their detriment in a variety of ways, in spite of the relationship of trust and confidence they had developed with Plaintiff.[117]  The Plaintiff denies any such wrongful conduct.[118]

[104]   In his Motion, Plaintiff argues that he does not owe a fiduciary duty to Douglas and Linda Lewis arising from his status as minority member and manager.[119] *See*, *e.g.*, *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473-74 (2009).

[105]   Plaintiff also contests Defendants' allegation that he breached a fiduciary duty to them by unauthorized use of Douglas Lewis' signature stamp, suggesting that another employee "cleared [a] fax[120] with Douglas Lewis before she submitted it."[121]

---

[115] Further analysis as to this Claim is not necessary for the purposes of this Opinion and Order.
[116] Answer 41, ¶ 70.
[117] *Id.* ¶¶ 71-72.
[118] Reply Countercl. ¶¶ 71-72.
[119] Pl. Mem. Supp. Pl. Mot. Summ. J. Defs. Countercl. 4.
[120] *Id.*
[121] *Id.* (citing Prince Dep. 38) (emphasis in original).

[106]   The court CONCLUDES that there exist genuine issues of material fact regarding whether Plaintiff owed Defendants any fiduciary duty or breached any such duty by his conduct.

[107]   Accordingly, Plaintiff is not entitled to summary judgment as to Defendants' Seventh Counterclaim, and as to it the Plaintiff's Motion should be DENIED.[122]

Defendant's Eighth Counterclaim – Fraud

[108]   In their Eighth Counterclaim, Defendants allege that Smith entered into the one-year unsigned Agreement, although he "knew at the time he agreed to such terms that he would not fulfill those terms"[123] and that Smith falsely represented that he would not use Douglas Lewis' signature stamp "for anything other than what Douglas Lewis had indicated."[124]

[109]   In *Williams v. Williams*, the North Carolina Supreme Court explained:

> It is generally held, and is the law in this State, that mere unfulfilled promises cannot be made the basis for an action of fraud (citations omitted).  If, however, a promise is made fraudulently – that is, with no intention to carry it out, thus being a misrepresentation of a material fact, the state of the promisor's mind, and with intention that it shall be acted upon, and it is acted upon to the promisee's injury—then, it will sustain an action based on fraud and misrepresentation (citations omitted) and the plaintiff will be entitled to legal or equitable relief (citations omitted) . . . . Mere proof of nonperformance is not sufficient to establish the necessary fraudulent  intent.

220 N.C. 806, 810-11 (1942) (citations omitted).

---

[122] Further analysis as to this Claim is not necessary for the purposes of this Opinion and Order.
[123] Answer 43, ¶¶ 77, 79-80.
[124] *Id.* 44, ¶¶ 83-84.

[110]   Here, Defendants' allegations relate to future actions.  In addition to the numerous allegations of Smith's nonperformance, Defendants allege that Smith knew they "would be traveling for extended periods of time, and thus knew that their ability to sign documents and to monitor [his] attendance and [his] work would be limited."[125]  As such, Defendants contend they have forecast evidence that "indicate[s] or warrant[s] the inference that [Smith] did not intend, at the time [he] made [the promises] to perform [the promises] when time for performance arrived."  *Id.* at 811.

[111]   Although it is a close question with regard to this Eighth Counterclaim, the court CONCLUDES that there exist genuine issues of material fact as to whether Plaintiff intended to defraud Defendants.

[112]   Accordingly, Plaintiff is not entitled to summary judgment as to Defendants' Eighth Counterclaim, and as to it Plaintiff's Motion should be DENIED.[126]

Defendants' Ninth Counterclaim – Conversion

[113]   Defendants' Ninth Counterclaim is premised upon their allegations that Plaintiff converted monies from the accounts of the Defendant Companies and proprietary information, including customer lists, work product and trade secrets.[127]

[114]   Though Plaintiff's Motion purports to seek summary judgment as to all of Defendants' Counterclaims, he does not specifically address the Ninth Counterclaim in his brief.  In the subsequent briefings, the parties do not discuss the Ninth Counterclaim.

[115]   Based on the foregoing, the court CONCLUDES that Plaintiff has abandoned his Motion with respect to the Ninth Counterclaim.  Accordingly, with regard to the Ninth Counterclaim, Plaintiff's Motion should be DENIED.

---

[125] *Id.* ¶ 81.
[126] Further analysis as to this Claim is not necessary for the purposes of this Opinion and Order.
[127] *Id.* ¶ 94.

NOW THEREFORE, based on the foregoing, it hereby is ORDERED that:

[116]  Plaintiff's Motion for Summary Judgment as to Defendants' Fourth Counterclaim is GRANTED, and said Fourth Counterclaim is DISMISSED.

[117]  The parties' respective Motions for Summary Judgment as to the remaining Claims and Counterclaims are DENIED.

[118]  On Wednesday, February 15, 2012, at 11:00 a.m., at the North Carolina Business Court, 225 Hillsborough Street, Suite 303, Raleigh, North Carolina, the court will conduct a hearing and status conference with all parties to this action for the purpose of setting this matter for trial and determining any remaining pre-trial issues.

This the 27th day of January, 2012.